Lesta MORRIS and Eddie Morris, individually, and David Kent Morris by his Guardian Ad Litem, Lesta Morris, Plaintiffs,

v.

PARKE, DAVIS & COMPANY, A DIVISION OF WARNER–LAMBERT, Wyeth Laboratories, a division of American Home Products Corporation, Lederle Laboratories, a division of American Cyanamid Company, Eli Lilly and Company, the National Drug Company, a division of Richardson-Merrell, Inc., et al., Defendants.

No. CV 82–5296–RJK (JRx).

United States District Court, C.D. California.

Sept. 15, 1983.

Ward, Dodd & Gaunt, Andrew W. Dodd, Torrance, Cal., for plaintiffs.

Lord, Bissell & Brook, John Dillard, Los Angeles, Cal., for defendant Parke, Davis & Co.

Morgan, Wenzel & McNicholas, Judith A. Lonsdale, Lee B. Wenzel, Los Angeles, Cal., for defendant Wyeth Laboratories.

Haight, Dickson, Brown & Bonesteel, Robert L. Dickson, Hall R. Marston, Santa Monica, Cal., for defendant Lederle Laboratories.

Morris, Polich & Purdy, Jeffrey S. Barron, Los Angeles, Cal., for defendant Eli Lilly and Co.

Hast & Sabatasse, Patrick J. Hast, Van Nuys, Cal., for defendant Merrell Dow Pharmaceuticals Inc. sued and served as The Nat. Drug Co.

## OPINION

KELLEHER, Senior District Judge.

This action arises out of personal injuries that plaintiff David Morris allegedly suffered in reaction to a diphtheria, pertussis and tetanus (DPT) vaccine. The vaccine was administered to him in June of 1965, when he was six months old. Since that time, David Morris has suffered from irreversible brain damage. Joined as plaintiffs are David's parents, Lesta Morris and Eddie Morris. Defendants are five pharmaceutical companies that allegedly manufac-

tured a substantial share of the DPT on the market at the time of David Morris' injury.

Plaintiffs seek to recover damages on five causes of action. The first four are standard products liability claims—negligence, express warranty, implied warranty, and strict liability. The fifth states a claim for concert of action. Federal jurisdiction is invoked on the basis of diversity of citizenship.

Plaintiffs concede that they are unable to identify the manufacturer of the vaccine actually administered to David Morris. The vaccine apparently was marketed under the generic name DPT; plaintiffs do not know, and indeed have no way to discover, who manufactured the DPT vaccine that caused the alleged injury. By bringing this action against companies that manufactured a substantial share of the DPT on the market at the time of David's injury, plaintiffs rely upon the "market share" theory expounded in *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132 (1980). In that case, plaintiff brought a class action against manufacturers of the drug diethylstilbesterol (DES). Plaintiff's mother had taken DES while pregnant, exposing plaintiff to the drug prior to birth. The DES allegedly caused plaintiff to develop adenosis, a deadly disease, many years later. As in the instant case, plaintiff could not identify the manufacturer of the drug that caused her injuries. Nonetheless, the California Supreme Court held that plaintiff had stated a valid claim. If plaintiff could show that DES had caused her illness, and could further establish that defendants had produced a substantial percentage of the DES on the market when her mother ingested the drug, the burden of proof would then shift to defendants to prove that they could not have made the substance that injured plaintiff. 24 Cal.3d at 612, 607 P.2d at 937, 163 Cal.Rptr. at 145. Each defendant unable to sustain that burden would be held liable for the proportion of the judgment represented by its share of the market. *Id.*

*Sindell* marked an important departure from the traditional concept of causation. While the plaintiff would still be required to trace her injuries to a specific product, she would not have to trace the product itself to a specific manufacturer. Rather, she could recover from every defendant who had introduced the offending substance into the marketplace, with each such defendant bearing liability in an amount corresponding to the likelihood that it had caused plaintiff's injuries.

Plaintiffs commenced the instant action on October 12, 1982, seeking both compensatory and punitive damages. In February of 1983, all five defendants joined in motions to strike the prayer for punitive damages. The motions were heard on April 4, 1983. Ruling from the bench, the Court denied defendants' motions to strike. Because these motions raised questions of first impression, the Court takes this opportunity to set forth the reasons for its decision.

### A. *Introduction*

In moving to strike plaintiffs' prayer for punitive damages, defendants contend that plaintiffs are precluded from such recovery as a matter of law. They argue that the *Sindell* rule allows compensatory damages, but that it cannot support the recovery of punitive damages no matter how egregious defendants' conduct is proven to be. The Court finds this view to be overstated. Although plaintiffs must carry a heavy burden in order to recover punitive damages, it cannot be said that they are absolutely foreclosed from such recovery. If plaintiffs are able to establish that their injuries were caused by DPT, and can further show that one or more of the defendants marketed the drug with conscious disregard for the health of consumers, they will be entitled to recover punitive damages from each such defendant. This view is not only consistent with *Sindell,* but also comports with the venerable line of authority recognizing that punitive damages are an indispensable deterrent to conduct that would endanger the public health.

Punitive damages have long been imposed upon tortfeasors whose actions are

deemed to be particularly nefarious.[1] In California this rule is embodied in section 3294 of the Civil Code,[2] which allows plaintiffs to recover exemplary damages from defendants who act with malice.[3] The statute defines malice as "conduct which is intended by the defendant to cause injury to the plaintiff or conduct which is carried on by the defendant with a conscious disregard of the rights or safety of others." Cal.Civ.Code § 3294(c)(1) (West Supp.1983).

In the instant case, plaintiffs do not allege that the defendants intended to cause David Morris' injury. They do allege, however, that defendants marketed DPT with conscious disregard of the safety of consumers. Accepting this allegation as true, as we must on defendants' motion to strike, the Court finds that plaintiffs' prayer for punitive damages is facially consistent with California's statutory scheme. This finding does not end our inquiry, however. The question of whether punitive damages may be awarded in a *Sindell* case raises problems both intricate and novel. In order to resolve these problems, the Court must look to the decisional law concerning both punitive damages and products liability, and then determine how these doctrines apply in actions brought under the theory of *Sindell*.

### B. *Punitive Damages: Function and Purpose*

Of the numerous functions commonly attributed to punitive damages, the two most frequently named are *punishment* and *deterrence*. "The primary purposes of punitive damages are punishment and deterrence of like conduct by the wrongdoer and others." *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 810, 174 Cal.Rptr. 348, 382 (1981). *See also* Owen, *supra* note 1,

at 1277–87. Punitive damages are thus one means by which society seeks to control injurious behavior that grossly violates accepted norms.

Commentators have suggested at least two secondary justifications for awarding punitive damages:

> First, they induce private persons to enforce the rules of law by rewarding them for bringing malefactors to justice. Second, such awards further compensate plaintiffs whose actual damages exceed those for which the law allows recovery and whose recovery in any event has likely been substantially depleted by attorneys' fees.

Owen, *supra* note 1, at 1278. *See also*, Ellis, *Fairness and Efficiency in the Law of Punitive Damages*, 56 S.Cal.L.Rev. 1, 3, 8–12 (1982).

These often-cited justifications reveal that punitive damages do not exist merely to redress individual wrongs. Rather, their primary purpose is to further the broader aims of society. Of the four functions named above, only one, the last, focuses upon the needs of the plaintiff. The others are directed at societal goals such as the prevention of wanton misconduct and the promotion of law enforcement. Although it is plaintiff who receives the punitive damages award, his enrichment is not the law's primary object. Indeed, the law recognizes that the award may constitute a windfall in some cases, but deems this to be an acceptable cost for the greater good that such awards accomplish.

### C. *Punitive Damages and Products Liability Litigation*

The California courts have repeatedly upheld the right of plaintiffs to recover puni-

---

**1.** Indeed, the practice of awarding punitive damages to private claimants appears to predate Western Civilization. *See* Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L. Rev. 1257, 1262–64 & n. 17 (1976).

**2.** Since this is a diversity suit, the question of whether plaintiffs may recover punitive damages is determined by state law. 1A J. Moore, W. Taggart, A. Vestal & J. Wicker, *Moore's Federal Practice* ¶ 0.310, at 3139 (2d ed. 1982). *See Wetzel v. Gulf Oil Corp.*, 455 F.2d 857, 860–62

(9th Cir.1972) (court rejected plaintiff's claim for punitive damages, applying state law).

**3.** "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Cal. Civ.Code § 3294(a) (West Supp.1983).

tive damages in products liability cases. *Hasson v. Ford Motor Co.*, 32 Cal.3d 388, 402–03, 650 P.2d 1171, 1179–80, 185 Cal. Rptr. 654, 662–63 (1982). *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d at 810, 174 Cal.Rptr. at 382–83; *G.D. Searle & Co. v. Superior Court*, 49 Cal.App.3d 22, 26–27, 122 Cal.Rptr. 218, 220–21 (1975); *Toole v. Richardson-Merrell Inc.*, 251 Cal.App.2d 689, 713–15, 60 Cal.Rptr. 398, 415–16 (1967). Punitive damages have also been expressly approved in cases involving defective drugs. *G.D. Searle & Co. v. Superior Court*, 49 Cal.App.3d at 26, 122 Cal. Rptr. at 221; *Toole v. Richardson-Merrell Inc.*, 251 Cal.App.2d at 713–14, 60 Cal.Rptr. at 415.

The policy considerations underlying the doctrine of punitive damages apply with especial force in the area of products liability. In an age of mass distribution of goods, the harmful consequences of reckless misconduct may be multiplied a thousandfold. A manufacturer who knowingly markets a defective product may endanger the safety of countless individuals. The deterrent value of punitive damages thus takes on added importance in these cases.

There is a second reason why punitive damages are particularly important as a deterrent in cases involving defective products. Ordinarily, the threat of liability for compensatory damages is sufficient to deter reckless misconduct. This may not be true in the commercial context, however. Courts and commentators have recognized that manufacturers may find it advanta-

geous to accept compensatory damages as a cost of doing business. *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d at 810, 174 Cal.Rptr. at 382; Owen, *supra* note 1, at 1291, 1292–95.[4] To the éxtent that corporations are tempted to adopt such policies, the law must take strong measures to dissuade them. "Governmental safety standards and the criminal law have failed to provide adequate consumer protection against the manufacture and distribution of defective products. Punitive damages thus remain as the most effective remedy for consumer protection against defectively designed mass produced articles." *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d at 810, 174 Cal.Rptr. at 382–83 (citations omitted).

### D. *Punitive Damages in Sindell Cases*

Numerous difficulties arise when one attempts to reconcile the doctrine of punitive damages with the peculiarities of the *Sindell* theory. Defendants contend that these difficulties are insuperable. The Court does not agree. While it is true that the *Sindell* theory raises singular problems, these problems cannot justify the wholesale abandonment of punitive damages. The *Sindell* theory is founded upon an overriding concern for the public health. The courts should be slow to adopt any rule that would compromise this paramount concern.

Defendants raise two objections to the availability of punitive damages in *Sindell* cases. The first of these relates to the

---

**4.** Professor Owen identifies two reasons why manufacturers may find it more profitable to pay compensatory damages than to remedy defective products. First, manufacturers may escape liability for all but a fraction of the injuries caused by their products. The reasons for this are twofold: (1) injured consumers may be ignorant of their legal right to compensation; and (2) even those consumers who are inclined to file a lawsuit may be dissuaded by the cost of litigation. Second, manufacturers may find compensatory damages to be less expensive than remedial measures, which often cause profit margins and sales to fall. Owen, *supra* note 1, at 1292–95. Professor Owen concludes that punitive damages are a necessary deterrent to corporate misconduct that endangers the public safety.

For a contrary viewpoint, see Priest, *Punitive Damages and Enterprise Liability*, 56 S.Cal.L. Rev. 123 (1982). Professor Priest states: "Once manufacturers are held liable, compensatory damages generally have been regarded as sufficient." *Id.* at 125. Priest then uses an elegant economic analysis to suggest that the practice of awarding punitive damages to consumers may actually cause a decrease in aggregate product safety. Theories such as this, which depend entirely upon unprovable and often counterintuitive assumptions, have no place in law. Where economic analysis is used to produce nonsensical results, the courts had best turn a deaf ear to commentators and follow the dictates of common sense.

question of causation. The second pertains to the difficulty of measuring and apportioning punitive damages in *Sindell* situations.

### 1. Problems of Causation

Defendants first argue that one cannot recover punitive damages absent a showing that the defendant personally participated in the injurious conduct. This argument is incorrect. The law of punitive damages does not invariably require a showing that the defendant participated in the acts causing plaintiff's injury. A well known example arises under the doctrine of respondeat superior. Under California law, an employer is subject to punitive damages for the acts of an employee where the employer knows the employee to be unfit and employs him "with a conscious disregard of the rights or safety of others." Cal.Civ.Code § 3294(b) (West Supp.1983). The fact that the employer does not directly participate in the injurious activity is of no consequence. To knowingly endanger the safety of others is deemed to be an act sufficiently culpable to justify an award of punitive damages.

The instant case presents an analogous situation. Here, plaintiffs allege that defendants knowingly introduced a dangerous drug into the market. As in the agency situation, defendants are charged with setting in motion a chain of events that was likely to cause harm to others. That sole act is sufficient to trigger liability for punitive damages.

The Court recognizes that this analogy is imperfect. In an agency case, the plaintiff can trace his injury directly to a given employee, who in turn may be traced to a specific employer. The plaintiff thus establishes a proven link between his injury and the employer's hiring practices. In a *Sindell* case, the plaintiff cannot trace his injury to the acts of a specific manufacturer. This failure of proof is not fatal, however. Like a plaintiff proceeding under respondeat superior, the *Sindell* plaintiff may be able to establish that the defendants acted with conscious disregard of human safety. This Court is unable to draw any meaningful distinction between the culpability of a reckless employer and that of a reckless manufacturer. Both have acted with conscious disregard of the rights of others. This is precisely the type of conduct that punitive damages were designed to deter. Where numerous manufacturers have engaged in such conduct, they should not be allowed to escape punitive damages simply because chance has made it impossible to identify which of them caused plaintiffs' injuries. The law of torts has recognized that the rules of causation may be relaxed in cases of aggravated misconduct. Owen, *supra* note 1, at 1268 n. 42. *See* Restatement (Second) of Torts § 501(2) (1965). To slightly modify the requirements of causation is particularly appropriate in *Sindell* cases. Theories such as that espoused in *Sindell* exist "not so much to solve problems of identification as to deter anti-social behavior." *Lyons v. Premo Pharmaceutical Labs, Inc.*, 170 N.J.Super. 183, 406 A.2d 185, 190 (1979) (discussing concert of action theory in context of DES litigation).

### 2. Problems of Measurement and Apportionment

Defendants' best arguments relate to the difficulty of measuring and apportioning punitive damages in *Sindell* cases. These arguments are not without merit. Nonetheless, it is hard to imagine how mechanical problems such as these can outweigh the need to safeguard the public health.

In order to determine the amount of punitive damages, the trier of fact normally considers the following factors: the degree of reprehensibility of defendant's conduct, the nature and extent of the harm suffered by the plaintiff, and the wealth of the defendant. Restatement (Second) of Torts § 908(2) (Tent.Draft No. 19, 1973). *See Grimshaw v. Ford Motor Co.*, 119 Cal. App.3d at 819, 174 Cal.Rptr. at 388. The wealth of the defendant is taken into account both to punish the wrongdoer and to set an example for others like him. The defendant's wealth may also serve to set an upper limit on the award. "The purpose of punitive damages is to sting, not to kill,

a defendant. Punitive damages should not be permitted to bankrupt a defendant." *In re Northern District of California "Dalkon Shield" IUD Products Litigation,* 526 F.Supp. 887, 899 (N.D.Cal.1981).

It is difficult to apply these guidelines in the instant case. If plaintiffs prove that one or more of the defendants acted with conscious disregard of human safety, and the trier of fact then considers the wealth of each of those defendants in measuring punitive damages, the resulting award may be so large that it would no longer be proportionate to the harm suffered. Plaintiffs would thus receive a windfall.

Defendants contend that this potential incongruence between the amount of the award and the actual extent of plaintiffs' injuries should bar recovery of punitive damages in all *Sindell* cases. This Court cannot accept such a draconian result. Although the problem identified by the defendants undeniably exists, it is not limited to *Sindell* cases, and should not be decisive here. Whenever a plaintiff seeks punitive damages from even one wealthy defendant, it is possible that the award will be far greater than the actual damages warrant. If this were not so, punitive damages might be inadequate to punish the defendant, and the deterrence function would be lost. Carried to its logical conclusion, defendants' argument suggests that wealthy defendants should always be immune from punitive damages because of the possibility that plaintiffs might receive a windfall. This would be absurd. The law cannot allow a blameworthy defendant to escape unpunished simply because of his wealth. Similarly, the combined wealth of the defendants in the instant case should not defeat plaintiffs' claim for punitive damages. The policy of safeguarding the public health must prevail, even at the cost of a potential windfall to plaintiffs.[5]

Finally, defendants suggest that there would be no logical way to apportion punitive damages among the various defend-ants. The *Sindell* case suggests that it would be best to assess punitive damages against each defendant in proportion to its market share. This approach is not workable, however. Defendants correctly point out that a defendant's market share may bear no relation to its net worth. The assessment of punitive damages thus could be too high, subjecting the defendant to an unjust punishment, or too low, subjecting it to an inadequate punishment. Conversely, defendants argue that if the Court looks only to the defendants' net worth and ignores their market shares, it will exceed the bounds of the *Sindell* theory, which is the very foundation of plaintiffs' lawsuit. Although this argument has some superficial appeal, the Court finds that it is based on a flawed analysis of *Sindell.*

In *Sindell,* the court was addressing only the question of *compensatory* damages. It should be borne in mind that compensatory and punitive damages serve two entirely different functions. Compensatory damages are intended to compensate the plaintiff for injuries actually suffered—medical expenses, lost earnings, and so forth. By apportioning the judgment among the defendants according to their market shares, the *Sindell* court ensured that every defendant would compensate the plaintiff in an amount related to the statistical likelihood that it had caused the injuries actually suffered. This approach makes much less sense in the case of punitive damages. Punitive damages are not intended to compensate the plaintiff for his injuries, but rather to punish the defendant and deter others from engaging in similar conduct. It is thus unnecessary that punitive damages be apportioned according to the likelihood that any particular defendant caused plaintiffs' injuries.

In the instant case, plaintiffs allege that the defendants marketed DPT with wanton disregard for human safety. Assuming that this is true, defendants are all culpable, regardless of their market shares, and the Court need not look to market share in

---

**5.** With respect to the windfall argument, Professor Owen states: "[T]his criticism of the doctrine invariably overlooks the important fact that this prospective windfall motivates many reluctant plaintiffs to press their claims. And as the litigation of such claims increases, misconduct is increasingly punished and deterred." Owen, *supra* note 1, at 1287.

**1330**

apportioning punitive damages among them. Rather, the Court should look to traditional yardsticks such as the wealth of the individual defendants and the relative blameworthiness of their conduct. The problem of apportionment is thus not the dilemma that defendants make it out to be. Certainly it does not outweigh the policy favoring punitive damages where defendants have acted with conscious disregard for human safety.

### E. Conclusion

Plaintiffs' prayer for punitive damages meets all of the specific requirements of California's statutes and case law. Normally, the simple allegation that defendants acted with conscious disregard for human safety would defeat defendants' motion to strike. What makes this a novel case is that plaintiffs are unable to show which manufacturer made the vaccine that actually caused David Morris' injuries. Plaintiffs have thus presented a claim for punitive damages that is ordinary in all respects, save one. The missing piece is causation: plaintiffs cannot trace their injuries to a specific act. Defendants argue that this gap is fatal to plaintiffs' punitive damages claim. The Court is unpersuaded. The very purpose of *Sindell* was to modify the rules of causation in order to bring within the reach of the law tortfeasors who might otherwise escape liability. If manufacturers act with conscious disregard for human safety, they should not be allowed to escape punitive damages simply because the nature of their activity makes it impossible to identify which of them is responsible for the resulting harm. To hold otherwise would not only defy *Sindell*, but would also undermine the crucial role of punitive damages in protecting the public health. The Court therefore holds that defendants' motions to strike must be denied. If plaintiffs succeed in establishing liability under the market share theory of *Sindell*, and can further show that one or more of the defendants marketed DPT with conscious disregard for human safety, they will be entitled to recover punitive damages from each such defendant.

It is well to note that denying the instant motion to strike is a far cry from awarding punitive damages to plaintiffs. Plaintiffs still must establish liability and prove that defendants acted with wanton disregard for the rights of others.