James L. HURLEY, Jr., et al.

v.

**LEDERLE LABORATORIES, DIVISION OF AMERICAN CYANAMID COMPANY and Connaught Laboratories, Inc.**

Civ. A. No. B–85–449–CA.

United States District Court,
E.D. Texas,
Beaumont Division.

Dec. 31, 1986.

Andrew Dodd, Dodd, Ward, Dodd & Gaunt, Torrance, Cal., Marcus A. Pitre, Wright & Pitre, Port Neches, Tex., for plaintiffs.

Richard L. Josephson, Baker & Botts, Houston, Tex., Richard McCarroll, Demaris Gullekson, Brown, Maroney, Rose, Barber & Dye, Austin, Tex., O.J. Weber, Mehaffy, Weber, Keith & Gonsoulin, Beaumont, Tex., for defendants.

## MEMORANDUM OPINION

COBB, District Judge.

Plaintiffs, parents of James L. Hurley, III, had their son vaccinated against diphtheria, pertussis (whooping cough), and tetanus by using DPT vaccine when the child was less than a year old. The vaccine was manufactured and distributed by the defendants Lederle Laboratories (Lederle), and Connaught Laboratories, Inc. (Connaught). Thereafter, the child sustained severe and irreversible neurological damage.

Plaintiffs, parents and son, brought this diversity action and base their claims on negligence [the alleged failure to adequately warn plaintiffs and properly design DPT], breach of express and implied warranties, and strict liability [the alleged production and marketing of an unreasonably dangerous product]. Plaintiffs also seek punitive damages, claiming the defendants recklessly, knowingly, and willfully failed to adequately warn of possible [dangerous] adverse reactions to DPT vaccine and willfully failed to rectify the product's design.

The case is presently before the court on defendants' motion for partial summary judgment. Defendants contend that federal law preempts plaintiffs' claims of defective design, inadequate labeling/warning, and punitive damages based thereon. Af-

ter considering all well pleaded facts in favor of plaintiffs, it is the court's opinion that defendants' federal preemption defense is valid and the defendants are entitled to partial summary judgment as a matter of law. There are several trial courts, state and federal, which have dealt with the questions presented by defendants' motions, with varied results and conflicting holdings. Inasmuch as this opinion deals only with the design and labeling of defendants' DPT vaccine, it does not necessarily apply to other FDA approved drugs in general.

## I. FACTS

Defendants Lederle and Connaught produce and market a vaccine commonly known as "DPT," a vaccine used to immunize children against the diseases of diphtheria, pertussis (whooping cough), and tetanus. DPT is comprised of three component parts: (1) diphtheria toxoids; (2) tetanus toxoids; and (3) a pertussis vaccine. 50 Fed.Reg. 51,013–14 (1985).

The pertussis component of DPT is a "whole cell" vaccine that contains, in an inactivated state, all of the components found in pertussis cells. 50 Fed.Reg. 51,043 (1985). Pertussis is a serious, highly contagious disease, primarily affecting infants and children. Before the introduction of this "whole cell" vaccine, pertussis crippled and killed thousands of children annually in the United States. In 1934, when this country suffered its worst pertussis epidemic, there were 265,000 reported cases of pertussis per year, and 7500 related deaths. Hinman and Koplan, *Pertussis and Pertussis Vaccine: Reanalysis of Benefits, Risks and Costs*, Journal of

the American Medical Association (June 15, 1984). By the early 1940's, pertussis was responsible for two and one-half times the number of deaths as all of the following diseases combined: measles, mumps, rubella, diphtheria, polio, meningitis, chicken pox, and scarlet fever. *Id.* Although the disease pertussis has been largely brought under control,[1] it remains a leading cause of infant deaths in other countries which lack vaccination programs. Moreover, the bacteria causing pertussis remain persistent, even where the disease is under control, which leads to the substantial probability of epidemics whenever the use of the DPT vaccine declines significantly. For these reasons, federal public health authorities, including the Food and Drug Administration (FDA), the Centers for Disease Control, the National Institute of Health, and other agencies, have for almost forty years, promoted vaccination of the populace with a diphtheria-tetanus-pertussis vaccine containing the so-called "whole cell" pertussis vaccine, licensed by the FDA in 1949.

However, it is suspected that the pertussis component of DPT can cause adverse reactions such as those listed on the package insert and suffered by plaintiff, since it is not well understood which parts of the organism are responsible for creating immunity. *See,* 50 Fed.Reg. 51,043 (1985). In 1980, the time of plaintiff's injury, the "whole cell" vaccine was *the only* licensed DPT vaccine on the market.[2]

DPT vaccine is a prescription biological product, subject to the provisions of the Pure Food, Drug and Cosmetic Act (21 U.S.C. § 301 *et seq.*), the Public Health

---

1. From 1943 to 1976, the country showed a 99% reduction in the reported cases of pertussis per 100,000 population, and an even more dramatic reduction in the number of deaths. But both the number of cases and deaths due to pertussis have remained constant since 1976. Cherry, *The Epidemic of Pertussis and Pertussis Immunization in the United Kingdom and the United States: A Comparative Study,* Current Problems in Pediatrics (1983).

2. *See,* 50 Fed.Reg. 51,104 (1985). During the 1960's and early 1970's, a "split cell" vaccine was

manufactured by Eli Lilly & Company. 50 Fed. Reg. 51051–52 (1985). Subsequently, Eli Lilly & Company ceased production of the product. Despite Eli Lilly's owning split-cell DPT patents, no other company was granted a license by the FDA to manufacture split cell DPT vaccine. The FDA has refused to relicense any fractionated cell product and has indicated that to manufacture and sell such a vaccine would constitute a criminal offense. *Toner v. Lederle Laboratories,* 779 F.2d 1429 (9th Cir.1986).

Service Act (42 U.S.C. § 262), and the regulations promulgated thereunder. Moreover, the State of Texas, through its Department of Health, has required its use as part of its state-wide immunization program.[3] TEX.ADMIN.CODE, Title 25, §§ 97.61, 97.63 (1979). As far as the court has been able to determine, all but nine of fifty-two jurisdictions (50 states, District of Columbia and Puerto Rico) require pertussis immunization of children at some time prior to their entry in day care centers, kindergarten, and grade school. Of those that do not absolutely require immunization, at least four states recommend it.

On November 19, 1980, a few months after his birth, the minor plaintiff James Hurley III was administered defendants' DPT vaccine by Dr. Lanier, who is not a defendant in this action. Shortly thereafter, the child developed a severe and irreversible neurological condition known as encephalopathy. For the purposes of ruling on the defendants' motions for summary judgment, the court assumes that the DPT vaccination was the legal cause of plaintiff's injuries, and that plaintiffs were neither negligent, nor assumed a risk in accepting the medication.

Lederle and Connaught furnished doctors purchasing DPT, such as Dr. Lanier, with pamphlets describing possible adverse side effects and contra-indications to the drug's use. The pertinent parts of the package insert provide:

> Adverse reactions may be local and include pain, erythema, tenderness and induration at the site of injection. Significant reactions attributed to the pertussis vaccine component have been high fever (greater than 39° centigrade), a transient shock-like episode, excessive screaming, somnolence, convulsions, *encephalopathy*, and thrombocytopenia. Such reac-

tions almost always appear within 24 to 48 hours after injection, but have been thought to occur after an interval as long as 7 days....

> Neurological disorders, such as *encephalopthy, possibly due to the pertussis component,* have been reported to occur rarely following the injection of this product, and they may be fatal, *or result in permanent damage to the central nervous system ...*

> Should symptomatology referable to the central nervous system develop following administration, no further immunization with this product should be attempted. Routine immunization should be postponed or avoided in patients with acute infections, or personal or family history of neurological disturbances ... (emphasis added)

According to Dr. Lanier's deposition testimony, he considered the above warnings to be accurate and adequate to apprise him of the risks involved in administering DPT. However, in spite of these warnings, injuries resulted from the drug's use, plaintiffs filed suit against Connaught and Lederle, and the court is faced with the difficult issue of preemption raised by the defendants' motion for partial summary judgment.

## II. THE SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provide that summary judgment should be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. FED.R.CIV.P. 56(c). Thus, the crucial question for the court to consider is

---

**3.** If a state or a local government participates in a federally funded immunization program, such as the program in Texas, it must meet certain federally imposed requirements. Among these requirements are submission of:

> (1) a "plan to assure that children begin and complete their immunizations on schedule ...," and

> (2) a "plan to systematically immunize susceptible children at school entry through vigorous enforcement of school immunization laws."

42 C.F.R. § 51b.204. Furthermore, declining to immunize against pertussis is not an option to participate in federally funded immunization programs. *See,* 42 C.F.R. § 51b.202.

whether there is a genuine issue of fact concerning any essential element of the plaintiff's claim. *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1195 (5th Cir.1986). If the moving party can show there is no evidence whatsoever to establish one or more of the essential elements of a claim on which the opposing party has the burden of proof, trial would be a "bootless" exercise. *Fontenot,* 780 F.2d at 1195.

Expanding on this concept, the Supreme Court in *Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 50, 88 L.Ed.2d 40 (1986), stated:

> If the defendant in a run-of-the mill civil case moves for summary judgment, or for directed verdict based on a lack of proof of material fact, the judge must ask himself not whether he thinks evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient. There must be evidence upon which the jury could reasonably find for the plaintiff.

*See also, First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). Thus, the summary judgment standard is the mirror of the standard for a directed verdict. In the instant case, the court finds the summary judgment evidence is such that it must hold federal law preempts plaintiffs' claims based upon inadequate warning/labeling and design of DPT vaccine; therefore, defendants are entitled to partial summary on these issues as a matter of law.

## III. THE PREEMPTION DOCTRINE

The doctrine of preemption is fundamentally based on Art. 6, Clause 2 of the United States Constitution, which provides:

> The Constitution and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, any-

thing in the laws of any state to the contrary notwithstanding.

*Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824); *see also, Fidelity Federal Savings & Loan Association v. De La Cuesta,* 458 U.S. 141, 152, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982).

Two types of preemption have emerged from federal jurisprudence: express preemption and implied preemption. Depending upon the statutory scheme, federal law may expressly preempt state law. *Pacific Gas & Electric Co. v. State Energy Resources Conservation and Development Commission,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983); *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); *see also, Cippollone v. Liggett Group, Inc.,* 789 F.2d 181 (3d Cir.1986).

In the absence of express preemption, federal case law has established four factors which must be analyzed in determining whether Congress intended to impliedly preempt or occupy a particular field of law:

> (1) The aim and intent of Congress as revealed by the statute itself and its legislative history; ...
>
> (2) The pervasiveness of the federal regulatory scheme as authorized and directed by the legislation and as carried into effect by the federal administrative agency ...;
>
> (3) The nature of the subject matter regulated and whether it is one which demands "exclusive federal regulation in order to achieve uniformity vital to national interest" ...; or,
>
> (4) "Whether, under the circumstances of a particular case, state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress."

*Northern States Power Co. v. State of Minnesota,* 447 F.2d 1143, 1143–47 (8th Cir.1971), *aff'd,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972); *KVUE, Inc. v. Austin Broadcasting Corp.,* 709 F.2d 922, 931–32 (5th Cir.1983), *aff'd sub nom, Texas v. KVUE, Inc.,* 465 U.S. 1092, 104 S.Ct.

1580, 80 L.Ed.2d 114 (1984); *see also, Cosmetic, Toiletry and Fragrance Association, Inc. v. State of Minnesota,* 440 F.Supp. 1216, 1220 (D.Minn.1977), *aff'd* 575 F.2d 1256 (8th Cir.1978), and generally, *Silkwood v. Kerr McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); *Pacific Gas & Electric Co.,* 103 S.Ct. at 1722; *Fidelity Saving and Loan Association,* 458 U.S. at 153, 102 S.Ct. at 3022.[4]

*KVUE, Inc. v. Austin Broadcasting Corp., supra,* states:

> The test of preemption is whether (1) the area requires national uniformity, (2) there is evidence of Congressional design to preempt the field, *or* (3) the state statute actually and directly conflicts with the federal.

This test is essentially the same as the test articulated in *Northern States Power Co.;* however, the court, for the sake of completeness, shall consider all four factors in *Northern States Power Co.* in reaching its decision. Any factor of the *KVUE, Inc.* or *Northern States Power Co.* standard, if satisfied, is independently adequate to justify finding federal preemption of state law.

■ In the instant case, the preemption issues arise by reason of the defendants' claim that the Food, Drug and Cosmetic Act (FDCA), the Public Health Service Act (PHSA), and their respective regulations preempt plaintiffs' state common law claims. State common law is subject to preemption as are state statutes, and regulations. *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 247, 79 S.Ct. 773, 780, 3 L.Ed.2d 775 (1959). *See*

also, *Sperry v. Florida,* 373 U.S. 379, 483 S.Ct. 1322, 1335, 10 L.Ed.2d 428 (1963); *Cippollone v. Ligget Group, Inc.,* 593 F.Supp. 1146, 1151–52 (1984), *reversed on other grounds,* 789 F.2d 181, *citing Garmon,*[5] *supra.* Beyond question, the FDA does have authority to promulgate regulations pursuant to 21 U.S.C. § 371(a) which are binding as law.[6] *National Association of Pharmaceutical Manufacturers v. FDA,* 487 F.Supp. 412, 414 (S.D.N.Y.1980). Furthermore, state common law can be preempted by federal regulation as well as by federal statutes. *Hillsborough County, Florida v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985).

## IV. PREEMPTION OF WARNINGS/LABELING OF DPT

■ In the present case, defendants do not contend, and the court has not found express preemption language in the Food, Drug and Cosmetic Act (FDCA), or the Public Health Service Act (PHSA) which supercedes state law. Therefore, the factors set out in *KVUE, Inc.* and *Northern States Power Co.* will be considered to determine whether implied preemption applies.

Neither party has been able to point to any aspect of the federal statutes or any relevant legislative history indicating Congressional intent to preempt state regulation of DPT labeling in the enactment of the FDCA and PHSA; therefore, the first *KVUE* factor is not present.

---

4. The court in *Fidelity Savings & Loan Association* stated that intent to prempt can be inferred where "[T]he scheme of the federal regulation [is] so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it" or "the Act of congress touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state law on the subject."

5. *Garmon* basically holds that where Congress decides to require national uniformity of regulation, Congress may exercise power to exclude

*any* state regulation. *De Canas v. Bica,* 424 U.S. 351, 359, n. 7, 96 S.Ct. 933, 938, n. 7, 47 L.Ed.2d 43 (1976) (emphasis in original).

6. The courts recognize the authority of the FDA to promulgate regulations concerning safety and design of drugs within the United States:

> Under the scheme of the Act [21 U.S.C. § 321], the ultimate determination of safety of a drug is not a matter given to the courts, but one to be determined by the Food and Drug Administration upon submission of an NDA. *United States v. 1,048,000 capsules (Afrodex),* 494 F.2d 1158, 1160 (5th Cir.1974).

However, viewing the second factor, the court finds that the comprehensiveness of the FDA regulation as to DPT labeling evidence a preemptive intent to occupy the field and precludes state regulation. In a product insert accompanying the DPT vaccine, as well as any pharmaceutical product distributed in the United States, certain information must be provided. This information includes:

(1) The composition of the product,

(2) The product's administration schedule,

(3) When the product's usage is indicated and contraindicated, and

(4) The product's potential adverse reactions which have been associated with the product's use.

21 C.F.R. §§ 610.60–610–65.

The contents and wording of these product inserts are extensively regulated and controlled by the FDA.[7] *See generally*, 21 C.F.R. §§ 1 and 201; 50 Fed.Reg. 51,108 (1985). Furthermore, the language in the product insert cannot be used or changed without prior FDA approval. 21 C.F.R. § 601.12. Thus, the comprehensive nature of the FDA regulations evidences preemptive intent to establish implied preemption as to the labeling/warning of DPT in the present case. Although implied preemption has been found upon this ground, which might be sufficient, further inquiry into the third and fourth factors of the implied preemption test is appropriate for consideration.

Examining the third factor of the implied preemption test, the court finds that the nature of DPT labeling relegates exclusive federal regulation in order to achieve uniformity vital to federal and national interests. *See generally, Florida Lime and Avacado Growers, Inc. v. Paul*, 373 U.S. 132, 143–44, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963). Drug labeling is an area where national uniformity is to be promoted, and constitutes a dominant federal interest. This position is supported by 50 Fed.Reg. 51,403 (1985) which states:

> FDA has a well established *policy of promoting uniformity in the area of labeling.* For example, in requiring a warning directed to pregnant and nursing women on all OTC drugs intended for systemic absorbtion, FDA addressed the need to have the same language appear in the same manner on all labels (C.F.R. 54753, December 3, 1982). This preference for uniformity is also recognized by the judiciary in its construction of the supremacy clause of the United States Constitution ... (emphasis added)

*See generally, Cosmetic, Toiletry and Fragrance Association, Inc. v. State of Minnesota*, 440 F.Supp. 1216, 1220 (D.Minn.1977), *aff'd*, 575 F.2d 1256 (8th Cir. 1978). On this ground, the court finds that plaintiffs' complaint of inadequate warning is preempted by federal law.

Applying the fourth factor, the court holds that state regulation of labeling/warning or a judicial restriction thereof would seriously and irreconcilably conflict with the federal statutory and regula-

---

**7.** 21 U.S.C. § 331 is the basic federal statutory enactment which proscribes the manufacture, sale, and marketing of misbranded drugs in interstate commerce. 21 U.S.C. §§ 331(a), (b), (c), (d), and (g). 21 C.F.R. § 1.21 expands on the meaning of "misbranded drugs" and provides, in pertinent part:

(a) Labeling of a food, drug, device, or cosmetic shall be deemed to be misleading if it fails to reveal facts that are:

(1) material in light of other representations made or suggested by statement, word, design, device or any combination thereof; or

(2) material with respect to consequences which may result from use of the article under:

(i) the conditions prescribed in such labeling or

(ii) such conditions of use as are customary or usual ...

\* \* \* \* \* \*

(c) Paragraph (a) of this section does not:

(1) permit a statement of differences of opinion with respect to warnings (including contraindications, precautions, adverse reactions, and other information relating to possible product hazards) required in labeling for food, drugs, devices, or cosmetics under the Act ...

tory scheme in this area. *See generally, Hines v. Davidowitz,* 312 U.S. 52, 67–68, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *Pacific Gas & Electric Co.,* 461 U.S. at 220, 103 S.Ct. at 1730. The FDA's intent and policy in the regulation of labeling/warning of DPT is to promote uniformity in the area of DPT labeling/warning, and to insure a complete and accurate explanation of the drug is provided to the medical community.[8] 44 Fed.Reg. 37,441 (1979). Warning/labeling pamphlets are intended to give notice of a drug's potential hazards and to convey documented statements concerning the drug's safety and effectiveness. *Id.* Labeling statements concerning safety are not permitted unless supported by scientific evidence which is neither false or misleading in any particular way. 44 Fed.Reg. 37,441 (1979); *see also,* 39 Fed.Reg. 33,232 (1974); 40 Fed.Reg. 15,394 (1975). In this case, the FDA has expressly approved the language in defendants' product insert. 50 Fed.Reg. 51,104 (1985). Thus, any Texas statutory or common law determination that defendants' labeling/warning is insufficient, inaccurate, or requires documentation on more than potential hazards and safety,[9] can create an irreconcilable conflict with the federal regulation of DPT labeling, and is therefore preempted. See statements by the FDA statements in 39 Fed.Reg. 33,230–32 (1974), which are:

It is ... apparent that there are very few statements in prescription drug labeling on which some controversy could not be found within the medical profession. Not infrequently, there are several points of view on a single issue. To permit or require statements of conflicting opinion on all of these matters *would destroy the present usefulness of prescription drug labeling.... (emphasis added)*

[I]f Congress were to provide that a representation, about the correctness of which qualified opinion differed, it would be misleading if the jury agreed with the expert's holding one view, but not misleading if the jury agreed with the expert's holding the other view, it is apparent that the manufacturer would be unable to tell in advance whether his labeling violated the statute [and that it would be] undesirable to permit misleading claims to be made simply because a few experts can be found on the occasion of a trial to support them.

Analogous is *Cipollone v. Liggett Group, Inc.,* 789 F.2d 181 (3d Cir.1986), in which the Third Circuit held that the Federal Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331–1340 (1982), impliedly preempted claims of defective labeling and inadequate warnings on cigarette packages. The Federal Cigarette Labeling and Advertising Act prescribed the exact language to be used on cigarette packages. Although the court in *Cippolone* did not find express preemption, it held that the Act impliedly preempted common law damage actions for inadequate warning/labeling, since these actions would have the effect of creating obstacles to the accomplishment of the full purposes and objectives of Congress in enacting the Federal Cigarette Labeling and Advertising Act.[10] *Cipollone,* 789 F.2d at

---

**8.** However, the FDA concedes that labeling information is not intended to be a dispositive treatise of all possible data on DPT or other drugs which it approves.

**9.** Plaintiffs contend that the FDA labeling/warning procedures prescribe minimum labeling requirements and that Texas courts are free to determine that the FDA warnings/labeling should be supplemented. However, the mere fact that a state regulation "supplements" federal law does not require a finding that there is no preemption." *Kennecott Corp. v. Smith,* 507 F.Supp. 1206, 1216 (D.N.J.1982). If

preempted, a complementary or supplementary state regulation is as invalid as one directly conflicting with the federal scheme. *KVUE,* 409 F.2d at 931; *see also, Pennsylvania v. Wilson,* 350 U.S. 497, 504, 76 S.Ct. 477, 481, 100 L.Ed. 640 (1956). Thus, in the present case, supplementary labeling/warning is also preempted.

**10.** The Act, as amended in 1970, expressly stated the policy behind the required warning: It is the policy of the Congress to establish a comprehensive federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health, whereby—

187. The holding is applicable here. The FDA, pursuant to Congressional authority, has decided what should and should not be contained in the DPT labeling/warning. If this court allowed claims against Lederle and Connaught as to defective DPT warnings/labeling, an actual and irreconcilable conflict with the FDA's determination inevitably would arise. Such ruling would allow state-by-state determination of adequacy, and would obviously undermine or overrule the FDA's duty to establish a uniform nation-wide system of useful product information as to the drug's effectiveness and its risks. 44 Fed.Reg. 37,436 (1979).

FDA mandated labeling preempts matters which such agency has specifically considered and addressed. *See, generally, Cosmetic, Toiletry and Fragrance Association, Inc. v. State of Minnesota,* 440 F.Supp. 1216, 1223 (D.Minn.1977), *aff'd* 575 F.2d 1256 (8th Cir.1978); *Pharmaceutical Society of the State of New York v. Lefkowitz,* 454 F.Supp. 1175 (S.D.N.Y.1978), *aff'd* 586 F.2d 953 (2d Cir.1978.) [11] The FDA has examined the risk of the exact injury sustained by plaintiff (encephalopathy), and addressed this issue by requiring the inclusion of the language contained in the package insert pertaining to defendants' DPT vaccine. Therefore, any Texas court finding which could require the con-

> (1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to the effect on each package of cigarettes; and
> (2) commerce and the national economy may be
> (A) protected to the maximum extent consistent with this declared policy and
> (B) not impeded by diverse non-uniform, and confusing cigarette labeling and advertising regulations with respect to any relationship between smoking and health. 15 U.S.C. § 1331 (1982). *Cippolone,* 789 F.2d at 184.

11. In *Lefkowitz,* the New York Generic Drug Substition Act required pharmacists to substitute lower priced FDA approved equivalent drugs for brand name prescription drugs whenever a physician indicated on the prescription that substitution was allowable. Even though the court did not find preemption on the facts of this case, the court stated:

> The objective of the New York legislation is to regulate the sale of drugs to the limited extent of preventing the patient-consumer from being forced to pay the higher price of brand

trary should be and is preempted by federal law. 50 Fed.Reg. 51,108 (1985); 50 Fed. Reg. 51,111–12 (1985); *See,* 50 Fed.Reg. 51,104 (1985) where the FDA determined that Connaught's vaccine was safe, effective, and *not misbranded* (emphasis added).

## V. TEXAS LAW ON ADEQUATE WARNINGS AND THE LEARNED INTERMEDIARY

Texas courts apply the Learned Intermediary Doctrine to the duty of a pharmaceutical manufacturer to adequately warn about prescription drugs. The Fifth Circuit fully recognized this rule in *Reyes v. Wyeth Laboratories,* 498 F.2d 1264 (5th Cir.1974), holding:

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers. The choice he makes is an informed one, an individualized medical judgment bottomed on the knowledge of both patient and palliative. Pharmaceu-

name drugs when less expensive generic equivalents are available, and his physician is willing to permit use of the substitute. *Determination of the safety and efficacy of the generic substitutes remains the function of the FDA.*
Thus, there is no actual conflict between the federal and state statutes. The Generic Drug Act does not ban any FDA approved drug and it does not frustrate Congress' purpose in enacting the Food, Drug and Cosmetic Act, *since the same federal agency (the FDA) still determines the safety and equivalency of generic substitutes that are furnished under the New York Act. Lefkowitz,* 587 F.2d at 958. (emphasis added) (citations and footnotes omitted).
Thus, the court in *Lefkowitz* implicitly stated that the determination of the safety and efficacy of drugs is the sole function of the FDA and that if any state drug law impinges on the FDA's determination, the state statute should be preempted.

tical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, and in selling prescription drugs are required to warn only the prescribing physician, who acts as a single "learned intermediary" between manufacturer and consumer. *Reyes*, 498 F.2d at 1276. (Footnote omitted) *See, Accord Cooper v. Bowser*, 610 S.W.2d 825, 831 (Tex.Civ.App.—Tyler 1980, no writ); *Gravis v. Parke Davis and Co.*, 502 S.W.2d 863, 870 (Tex.Civ. App.—Corpus Christi 1973, writ ref'd n.r. e.).

Since DPT is a prescription drug, the only relevant inquiry in this case is whether Lederle and Connought adequately warned plaintiffs' prescribing physician, Dr. Lanier, of DPT's dangerous propensities. By deposition, Dr. Lanier testified:

Q. Were you able to read that section under "Adverse Reactions?

A. Okay.

Q. I take it that you were.

A. Yes.

Q. Does that section have all the reactions that, in your general medical knowledge are known to recur—to occur after DPT vaccination?

A. I wouldn't swear to that. They might have added a sentence or two in there that I didn't remember about.

Q. Okay. So, in actuality, there may have been a little bit more in there?

A. Possible.

Q. Okay. Are there any reactions that you know of, either in 1980, or that you know of now, that are not included in that "Adverse Reactions" section?

A. No.

Q. Do you think this "Adverse Reaction" section adequately apprises you of the risks involved with DPT vaccine?

A. Yes.

Defendants have thus fulfilled their duty to warn Dr. Lanier of the drug's adverse reactions, and the court finds that defendant's labeling/warning as to DPT to be adequate as a matter of law. The recent decision of *Smith v. Wyeth Laboratories, Inc.*, No. 84–2002, Slip Op. (S.D.W.Va. August 21, 1986),

held the warnings contained in Wyeth Laboratories' product insert [a "whole cell" DPT vaccine in use in 1981] to be adequate as a matter of law. In *Smith*, the Wyeth product insert was virtually identical in substance to the Lederle/Connaught product insert in the present case. The court in *Smith* stated:

The plaintiffs also contend that the defendants are liable because they failed to warn consumers directly, or to require doctors to warn their patients of the dangers of DPT vaccine. As observed earlier, no such duty exists with regard to manufacturers of prescription drugs. The only duty of such manufacturers is to adequately warn the prescribing physician of the drug's dangerous propensities. Accordingly, the adequacy of the warnings communicated to the physicians prescribing the DPT vaccine must next be considered.

The plaintiff cites no authority for the proposition that a drug manufacturer has a duty to warn prescribing physicians of the rate of adverse reactions. As a practical matter, this would be extremely difficult, perhaps impossible, with respect to a drug like the DPT vaccine, which has many possible harmful side effects. Moreover, the warning states: The below listed serious adverse reactions have been reported ... Thereafter, the warning lists with specificity seven serious reactions, one of which inflicted the minor plaintiff. The warning also refers the physician to medical research material further explaining the possible consequences of administering the DPT vaccine. Based upon the foregoing, it is clear that the warning adequately warns of the severity and nature of adverse reactions as a *matter of law* ... (emphasis added)

*Smith*, No. 84–2002, Slip Op. at 23–25. Not only is plaintiffs' claim of inadequate warning/labeling preempted by federal law, but also the information contained on defendants' product insert is sufficient as a mat-

ter of law to apprise the purchasing doctors of the side effects to the DPT vaccine.[12]

*See also, Chambers v. G.D. Searle & Co.,* 441 F.Supp. 377 (D.Md.1978), aff'd per curiam, 567 F.2d 269 (4th Cir.1976).

## VI. PREEMPTION OF DESIGN DEFECTS

■ At the outset, it is noted that DPT vaccines have come under criticism in recent years, both in the legal and medical community. Medical evidence indicates that the safety and efficacy of DPT vaccines may not reach the levels that some physicians assume they do. Report from Kevin C. Geraughty, M.D. to Andrew Dodd (February 12, 1986) (discussing pertussis vaccine), at 6, 25. In fact, the degree of safety and efficacy of DPT may vary from vial to vial, and lot to lot. *Id.* Alternative technologies exist for the production and design of DPT which may add additional safety steps in its use. *Id.* However, the court is not to determine whether the design and production method of DPT is safe and effective. Rather, the question which the court must decide is whether federal law preempts a Texas judicial determination that DPT could be held defective in both production method and in design.

Since express preemption language has not been found in the FDCA or the PHSA, the factors set out in *KVUE, Inc.* and *Northern States Power Company, supra,* must determine whether implied preemption applies here. As to the first factor of the implied preemption test, neither the language in the above statutes, nor their legislative histories provide sufficient indicia of express Congressional intent to preempt state regulation in the area of DPT design.

However, considering the second factor, the court finds that the comprehensive and pervasive nature of the FDCA, the PHSA, and their respective regulations, evidence preemptive intent so strong that it precludes any state law determination that DPT is defectively designed. The FDA has promulgated rules and regulations which encompass the licensing, testing, production, distribution, review, and approval of all biological DPT vaccines. *See generally,* 21 C.F.R. §§ 211, 312, and 600, *et seq.* Each DPT manufacturer must be licensed,[13] and must submit detailed descriptions to the FDA which define the process and methods which will be used to manufacture the DPT vaccine.[14] The FDA must review and approve the manufacturing process before a manufacturer is permitted to produce DPT.[15] The FDA prescribes certain personnel qualifications,[16] conducts inspections of a manufacturer's facilities,[17] and requires specific testing of each batch of DPT vaccine.[18] The results of such tests, along with a sample of that batch of DPT vaccine, must be submitted to the FDA for review and possible further testing.[19] Furthermore, additional FDA regulations prescribe certain standards as to the packaging, labeling, storage, and

---

**12.** Plaintiffs maintain that in a mass immunization program, a "clinic-like" atmosphere has emerged where it is routine for a nurse or other health care personnel [instead of a licensed physician] to administer the DPT vaccine without informing the patient of the drug's adverse reactions. Thus, plaintaiffs contend that the Special Circumstances Exception to the Learned Intermediary Doctrine should apply in the present case. This exception states that "where no individualized medical judgment intervenes between the manufacturer of a prescription drug and the ultimate consumer, it is the responsibility of the manufacturer to see that warnings reach the consumer." *Davis v. Wyeth Laboratories,* 399 F.2d 121 (9th Cir.1968); *Reyes,* 498 F.2d at 1276. The court need not address whether this exception should be applied in the instant case, since any claim concerning the

adequacy of DPT warnings has been preempted by federal law, and since the warnings were adequate as a matter of law. *See discussion, supra.*

**13.** 21 C.F.R. § 601.1.

**14.** 21 C.F.R. § 601.2.

**15.** 21 C.F.R. § 601.25.

**16.** 21 C.F.R. § 211, subpart B.

**17.** 21 C.F.R. § 600.20.

**18.** 21 C.F.R. § 610, subparts A and B.

**19.** 21 C.F.R. §§ 610.1, 610.2.

record processing of the DPT vaccine.[20] There are also exhaustive FDA regulations regarding investigation, testing, and reporting on "new designs or new types" of DPT vaccines. *See generally,* 21 C.F.R. § 312, *et seq.* Even the pertussis element of DPT can be produced only in conformity with 21 C.F.R. §§ 620.1–620.7. Furthermore, the stringent testing requirements of DPT mandated by the Public Health Service Act and the rules promulgated thereunder are comprehensive and pervasive as to evidence a Congressional intent to occupy the field as to DPT design.[21] Thus, as demonstrated by the broad spectrum of rules and regulations above, implied preemption has been found as to plaintiffs' claim that DPT is defectively designed and produced. However, preemption has not been found on this ground alone.

Applying the third factor of the implied preemption test, the court finds there are dominant and overriding federal interests in promoting uniformity in the design and manufacture of DPT vaccines. It is true as plaintiffs have argued, and as the Supreme Court has held in *Hillsborough County, Florida, supra,* matters involving health and safety of citizens are generally reserved to the states. However, those matters which are ordinarily reserved to the states can be subject to the doctrine of implied preemption. Congress, by vehicle of the Commerce Clause, has regulated in this field by enacting the Food, Drug and Cosmetic Act and the Public Health Service Act. Although legislating the transportation of food and drugs in interstate commerce was one of Congress' goals in enacting the FDCA, another purpose was the protection of the health of the citizens of the United States. *U.S. v. Lee,* 131 F.2d 464, 466 (7th Cir.1942). In Congress's view, the enactment of the FDCA was necessary since the states had not properly exercised the power reserved to them in matters of safety and health. Thus, a dominant federal interest exists in protecting the safety and health of the citizens of this country when the states have failed or refused to act. The use of DPT vaccine has been one way to accomplish the protection of public safety and health. As evidence of FDA's intent to promote uniformity in the design of DPT, all but nine of 52 jurisdictions [50 states, District of Columbia and Puerto Rico], require DPT vaccine [with the "whole cell" pertussis component] as part of their public health immunization programs which are federally funded and sponsored. Additionally, the "whole cell" DPT vaccine remains the only DPT vaccine currently licensed by the FDA, further evidencing an intent to keep the design of DPT uniform nationwide.

Furthermore, any pharmaceutical manufacturer's attempt to produce and market other designs of DPT vaccine (especially the "split cell" design) could result in criminal prosecution. In *Toner v. Lederle Laboratories,* 779 F.2d 1429, 1431 (9th Cir. 1986), the Court of Appeals of the Ninth Circuit has emphatically held:

> The principal threat of appellee's negligence argument at trial concerned Lederle's failure to develop a factionated cell product. In support of this theory, appellees contend that Tri-Solgen was shown to be a safer yet equally efficacious pertussis vaccine. Appellee's experts testified that the whole cell vaccine was five times more reactive than the fractionated cell product, and that early studies indicated that Tri-Solgen caused fewer local reactions than the "whole cell" vaccine ... However, in 1972, a review panel within the Bureau of Biology of the FDA refused to certify Tri-Solgen as "safe and effective" although it did so certify the whole cell vaccines. *Because the FDA has refused to re-license Tri-Solgen or any other fractionated cell product, the manufacture and sale of such a vaccine by Lederle, or any other pharmaceutical company, would constitute a criminal offense under the Food, Drug and Cosmetic Act.*

---

**20.** 21 C.F.R. §§ 201, 211, subpart G, J, and § 620 subpart A.

**21.** *Morris v. Parke Davis and Co.,* No. 82–5296, Slip Op. at 1 (C.D.Calif. September 19, 1985) [Available on WESTLAW, DCT database].

See 21 U.S.C. §§ 331(d), 333(a), 355(a) (1982).[22] (Emphasis added)

Thus, the FDA's intent in promoting uniformity in the design and manufacture of DPT could be nullified if Texas tort law provides a jury the right to determine to the contrary. As stated earlier, there are numerous and various holdings of trial courts, state and federal, on the matters under consideration, some of which are conflicting. Our search has found only one holding by a United States Court of Appeals: The case of *Toner v. Lederle Laboratories, supra.*

In addition, under the fourth factor applicable to the existence of implied preemption, the court finds that the possibility of a jury's determination under Texas law that the design and production of DPT is defective will stand as an obstacle to the accomplishment of federal objectives in enacting the FDCA, the PHSA, and their respective regulations which have the force and effect of federal law. Plaintiff's design defect theory directly hampers the national policy of encouraging and financially supporting immunization programs used to counter the effects of diphtheria, pertussis, and tetanus. This national policy is stated by the FDA and the Department of Health and Human Services:

> FDA agrees that the immunization of children for tetnus, diphtheria, and pertussis should continue to be emphasized. *Such immunization programs are part of national policy.* In April 1977, the Department [of Health and Human services] announced a plan to achieve immunization of the three million infants born in the United States each year, as well as those already born who had not been immunized. The target diseases include tetanus, diphtheria, pertussis (under age 7), measles, mumps (under age 7), rubella, and polio. *The national program* successfully raised immunization levels from a range of 66 per cent to 75 per cent in 1977, to immunization levels of 95 per cent or greater for these diseases in children entering school for the school year 1981–1982. The Department has affirmed that the immunization program will continue to be emphasized. (emphasis added)

50 Fed.Reg. 51,109 (1985). This national policy is further emphasized by Congress' enactment of the Vaccination Assistance Act of 1962, Public Law No. 87–868, 76 Stat. 1155 [which is presently the Immunization Grant Program]. This Act was designed "to assist states and communities to carry out intensive vaccination programs designed to protect their populations, particularly all preschool children, against poliomyelitis, diphtheria, whooping cough, and tetanus ..."

Obviously, plaintiffs' design defect theory would also directly impact on the national policy promoting adequate production and supply of DPT vaccine. This policy insures that products such as DPT will be available despite commercial incentives to discontinue production for reasons other than lack of current or potential need. 50 Fed.Reg. 51,109 (1985). There is presently an effort to begin a federal stockpile of DPT vaccine that would represent approximately a six-months supply. The stock-piling efforts are under way in response to a recent shortage in the supply of DPT vaccine. The supply of DPT in 1983, which was adequate to meet the country's needs,

---

**22.** 21 U.S.C. § 331 states:

"The following acts and the causing thereof are prohibited:

\* \* \* \* \* \*

(d) The introduction or delivery for introduction into interstate commerce of any article in violation of § 344 or 335 of this Title" ...

21 U.S.C. § 333 states:

"Any person who violates a provision of § 331 of this Title shall be imprisoned for not more than one year or fined not more than $1,000 or both."

21 U.S.C. § 355 is entitled "New Drugs—Necessity of Effective Approval of Application," and states:

"(a) No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) of this Section is effective with respect to such drug."

was approximately 18.2 million doses, which decreased to 15.6 million in 1984. The vaccine shortage recently experienced was a serious public health concern, but is mild in comparison with the effects of a possibly larger, and longer-lasting shortage.

Thus, a state common law determination that DPT design and manufacture is defective will seriously and irreconcilably conflict with the federal regulatory scheme and the national policies of immunization, adequate production, and supply of DPT. In effect, it will chill the efforts of the federal government to ensure that all U.S. children are immunized and frustrate Congress' intent in fostering such programs.

In addition, preemption is extended to plaintiffs' state common law theory that alternate safety steps (as opposed to methods of production) should be added to defendants' method of production. The FDA has determined the manufacturing process employed by defendants and the "whole cell" DPT design to be safe and effective.[23] 50 Fed.Reg. 51,104 (1985); 50 Fed.Reg. 51,-055 (1985). Indeed, to do otherwise can be a criminal offense. *See, Toner,* 779 F.2d at 1431. Requiring additional steps or procedures in defendants' method of production

would be a judicial determination that defendants' DPT vaccine was not safe and effective, and would thereby unjustifiably conflict the FDA's long standing determination.[24] This, the courts cannot and should not do.

Many of the plaintiffs' suggested safety steps have been expressly considered and rejected by the FDA as additional requirements. Thus, the FDA has examined the specific risks which injured the plaintiff and has already required the present safety steps to alleviate the risks, thereby precluding a state's right to regulate. *See, generally, Cosmetic Toiletry and Fragrance Association, Inc. v. State of Minnesota,* 440 F.Supp. 1216, 1223 (D.Minn.1947), *aff'd* 575 F.2d 1256 (8th Cir.1978). 50 Fed.Reg. 51,111–12 (1985); 50 Fed.Reg. 51,114–15 (1985). In the absence of a showing that the plaintiff's injuries were caused by a known danger which additional safety steps would have prevented within reasonable scientific or medical probability, the FDA's determination that the defendant's design and method of production was safe and effective are controlling. Additional judge-made requirements of safety procedures and methods should not be imposed by this court.

**23.** The FDA has determined that the "whole cell" DPT vaccine is "state of the art." The FDA authorized special panels to be formed to review the safety, adequacy, and labeling of all biological products. *See,* 21 C.F.R., §§ 601.25, 601.26. The review panels determine whether the licenses for the biological products meet contemporary standards of safety, purety, and potency. The review also determines whether the biological products are effective for their labeled uses, and therefore not misbranded within the meaning of § 302(a) of the FDCA. Each advisory review panel classifies products into one of three following categories:

(1) Category I: Biological products determined by the panel to be safe, effective, and not misbranded. *See,* § 601.25(e)(1).
(2) Category II: Biological products determined by the panel to be unsafe, ineffective, or misbranded. *See,* § 601.25(e)(2).
(3) Category III: Biological products determined by the panel not to fall within either category I or II, because the available data are insufficient for classification and further testing is therefore required. *See,* § 601.25(e)(3).
These products fall into two subcategories:

(a) Category III.A: Biological products recommended for continued licensing, manufacturing, and marketing while questions raised on the products are being resolved by a further study. This recommendation is based on an assessment of the present evidence of safety and effectiveness of the product, and of potential benefits and risks likely to result from the continued use of the product for a limited period of time. Those category III.A. products found to meet standards of safety and effectiveness consistent with state of the art methodology for those products would be placed in category No. I, and would remain on the market. *See,* 47 Fed.Reg. 44062 (1982). Both Connaught's and Ledlerle's whole cell DPT vaccine have been determined by the review panel to fall into Category No. I, Biological Products; thus, the defendant's DPT vaccine has been determined to be safe, effective, and not misbranded. *See also,* 50 Fed.Reg. 51054–55 (1985).

**24.** Once preemption has been found, complementary or supplementary state regulation is as invalid as one directly conflicting the federal scheme. See Footnote # 9, *supra.*

## VII. PUNITIVE DAMAGES

It is further held that since federal law has preempted plaintiff's claims of defective design and inadequate warning/labeling, no punitive damages are available under these theories. However, punitive damages are not preempted as to any other theories which plaintiffs assert.

## VIII. CONCLUSION

The fact that there is little legislative history of intent to preempt state regulation in the design and labeling of vaccines when the Food, Drug and Cosmetic Act was enacted does not preclude a finding of preemption. *Cosmetic, Toiletry and Fragrance Association, Inc. v. State of Minnesota,* 440 F.Supp. 1216, 1221 (D.Minn. 1977) *aff'd* 575 F.2d 1256 (8th Cir.1978) Preemption of plaintiffs' claims has been found pursuant to other factors set forth by the Court of Appeals in *KVUE, Inc., supra,* and *Northern States Power Co., supra.* The pervasiveness of the statutes and regulations in this field, the dominant federal interest in promoting uniformity in labeling and design of DPT, and the irreconcilable conflicts a state law determination would have on federal policies as to the labeling and design of DPT mandates this court to hold preemption applies.

The difficulty in reaching this decision stems from the fact that few precedents have been established in this area of the law. The few cases which have addressed the issues before the court can either be distinguished or support the court's position. The District Court in *Smith v. Wyeth Laboratories,* No. 84–2002, Slip Op. at 8–9 (S.D.W.Va. August 21, 1986) recently held that plaintiffs' claim based upon defective design of DPT was not preempted by federal law. The *Smith* decision can be distinguished from the present case. The *Smith* decision failed to deal with several issues in the federal preemption context. The opinion is completely silent on the application of the PHSA, the FDA, and the Federal Register pronouncements as to DPT's role in the United States immunization policy. The *Smith* court, without analysis, stated that heavy regulation of the pharmaceutical industry was not enough to show preemption. The opinion also ignores other criteria for finding implied preemption in this area, such as whether the DPT design and labeling requires national uniformity, or whether state law actually and directly conflicts with federal interests. Furthermore, the *Smith* court relies primarily on the *Silkwood* opinion in reaching its decision. Unlike *Silkwood,* the motions for summary judgment in the present case do not deal with claims concerning violations of the federal regulations. Instead, Lederle and Connaught are not trying to preempt any cause of action where a violation of federal regulations can be demonstrated.

*Milam v. American Cyanamid Co.,* No. 4–85–92–K, Slip Op. at 1 (N.D.Tex. October 15, 1986), is another recent decision in the area of DPT design and labeling preemption. Upon defendant's motion for summary judgment in *Milam,* Judge Belew held *in toto* that the Food, Drug and Cosmetic Act did not expressly preempt plaintiffs' claims based upon strict liability, inadequate warning, and punitive damages. The court did not address whether implied preemption could be found. Therefore, this case is distinguishable from the present action.

The recent case of *Morris v. Parke Davis,* No. 86–7115, Slip Op. (9th Cir.1986) may well support the finding of implied preemption. In *Morris,* the United States District Court for the Central District of California, Judge Kelleher held that plaintiff's state law claims for product liability as to DPT design were preempted by federal regulations under the Public Health Service Act. The plaintiffs in *Morris* petitioned the Ninth Circuit for a writ of mandamus, contending that the preemption order was clearly erroneous and unconstitutional as a matter of law. The Ninth Circuit, after oral argument, denied plaintiffs' attempt to mandamus Judge Kelleher to vacate his summary judgment order. Thus, the Ninth Circuit order lets stand the District Court's decision upholding implied

preemption of design defect theories pending trial and subsequent appeal.

The case of *Toner v. Lederle Laboratories, supra,* appears to be the only U.S. Court of Appeals authority in this area of law. As the court held in *Toner,* if the defendants in this case had manufactured, distributed, and sold in interstate commerce another DPT vaccine, they would be subject to criminal prosecution. Since one, and only one, DPT vaccine was being manufactured in the United States in 1980 under the rigorous, but legal restrictions and requirements of the Food and Drug Administration, to permit state law to be substituted for the field preempted by federal law could result in 50 (or 52 if the District of Columbia and Puerto Rico are included) different interpretations as to whether the design and labeling was adequate or inadequate, effective or ineffective, helpful or harmful, and such result would evicerate the program to prevent the spread of these debilitating and often fatal diseases among infants and children of this country.

Plaintiffs' attorneys have stated to the court in arguments during the hearings on defendants' motions for summary judgment that there are over one hundred of these cases presently pending in various state and federal trial courts. While no such summary judgment evidence has been submitted, there is no reason to doubt this assertion and the court readily accepts it as true. As tragic as this may be to those one hundred plus children and their parents, neither this court, nor any trial court, should uproot a four-decade effort of the federal government to eliminate this dread disease and turn the clock back to 1934, when this nation, with only half of its present population, suffered an epidemic of over a quarter of a million cases of pertussis and buried over seven thousand of its children. Yet this could be the effect if the court now holds that the only lawfully produced, manufactured, tested, licensed, reviewed, monitored, approved and labeled pertussis vaccine is found to be defectively designed and labeled.

Plaintiffs contend that preemption of their state tort claims essentially leaves them without a remedy. Plaintiffs cite language in *Silkwood,* which states that the presumption against preemption is strengthened where preemption would leave a putative plaintiff without an adequate remedy for violations of his or her state created rights. *See, Silkwood,* 104 S.Ct. at 626. This decision is not to be construed to mean necessarily that defendants' DPT vaccine is not defective in fact, or that defendants' actual method of production is free from scrutiny. The court's holding merely finds that federal law as to defendants' design and labeling of DPT preempts plaintiffs' state tort claims in this respect. Plaintiffs are not without a remedy since this court has preserved all of the other claims made by the plaintiffs.

Furthermore, *no other DPT design has been adequately demonstrated to be both safer than and as effective as the "whole cell" DPT vaccine* manufactured and marketed by defendants. The benefits of vaccination with "whole cell" DPT clearly outweigh the risks associated with it. If a state may set higher standards for DPT, and thus prevent its distribution, the national need for the benefits of DPT may not be met.

Finally, the court notes that the primary responsibility of manufacturers such as Lederle and Connaught is to comply with the federal regulations regarding the production and marketing of DPT. If these obligations are fulfilled and the DPT vaccine is administered correctly, responsibility for immunization accidents should rest with the official agencies charged with testing, approving and recommending them. 50 Fed.Reg. 51,006 (1985).

Therefore, the defendants' motion for partial summary judgment is hereby GRANTED, and plaintiffs' state law claims for damages and punitive damages based upon inadequate warning/labelings and defective design of DPT are hereby held to be preempted by federal law. All other causes of action asserted by plaintiffs remain, and are before the court for trial on

the merits. Counsel for defendants will submit an appropriate order.