219 N.J. Super. 601 (1987)
530 A.2d 1287
CLARA MORGAN SHACKIL, ALBERT SHACKIL, AND DEANNA MARRERO, P/P/A HER MOTHER AND NEXT FRIEND CLARA MORGAN SHACKIL, PLAINTIFFS-APPELLANTS,
v.
LEDERLE LABORATORIES, A DIVISION OF AMERICAN CYANAMID CO.; AND WYETH LABORATORIES, A DIVISION OF AMERICAN HOME PRODUCTS CORPORATION; WYETH LABORATORIES, INC.; PARKE-DAVIS, A DIVISION OF WARNER-LAMBERT CO.; ELI LILLY AND COMPANY, DEFENDANTS-RESPONDENTS, AND PITTMAN-MOORE AND ITS SUCCESSOR, THE DOW CHEMICAL COMPANY AND LEO FELD, M.D., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 10, 1987.
Decided August 12, 1987.
*607 Before Judges DREIER, SHEBELL and STERN.
Jan Schlichtmann, pro hac vice, of the Massachusetts Bar, argued the cause for appellant (Blume, Vasquez, Goldfaden, Berkowitz & Oliveras, attorneys; John M. Blume, of counsel; Michael R. Hugo, on the brief).
J. Peter Coll, Jr., pro hac vice, of the New York Bar, argued the cause for respondent Lederle Laboratories (Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, attorneys; James L. Melhuish, of counsel and on the brief).
Anita Hotchkiss argued the cause for respondent Wyeth Laboratories, Division of American Home Products Corporation, Wyeth Laboratories, Inc. and Parke Davis & Company (Porzio, Bromberg & Newman, attorneys; Ms. Hotchkiss, of counsel and on brief; and Lisa Murtha, on the brief).
John L. McGoldrick argued the cause for respondent Eli Lilly & Company (McCarter & English, attorneys; Mr. McGoldrick, of counsel and on the brief; John F. Brenner, Jerry P. Sattin, Richard A. Bagger and Marna L. Brown, on the brief; Shook, Hardy & Bacon, of counsel).
McDonough, Murray & Korn, attorneys for Leo Feld, M.D. (William S. Mezzomo, on the brief).
Thomas F. Campion argued the cause amicus curiae for Merck & Co., Inc. (Shanley & Fisher, attorneys; Mr. Campion, of counsel and on the brief).
*608 Tompkins, McGuire & Wachenfeld filed a brief amicus curiae for Abbott Laboratories (William B. McGuire, of counsel and on the brief).
Lamb, Hartung, Coughlin, Kretzer & Reinman filed a brief amicus curiae for The Upjohn Company (Edwin A. Hartung, of counsel and on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
Plaintiffs have appealed, by leave granted, from an interlocutory order dismissing their negligence, warranty, misrepresentation, and strict liability action against Lederle Laboratories, Wyeth Laboratories, a Division of American Home Products Corporation, Wyeth Laboratories, Inc., Parke-Davis, and Eli Lilly & Co. By amended complaint plaintiff added Pittman-Moore as a defendant. National Drug Company, an additional manufacturer of the drug in question, was not joined, since plaintiffs contended that as a result of their discovery they found no basis to determine that the drug actually administered was manufactured by National Drug Company.[1]
The claims in this case arose out of an administration of the pertussis (whooping cough) antigen component of a pharmaceutical product known as the diphtheria, pertussis and tetanus toxoid (DPT) vaccine. The DPT vaccine is not a formularized synthetic chemical substance, but rather a licensed prescription biological product subject to the provisions of the Federal Food, Drug & Cosmetic Act, 21 U.S.C.A. § 301 et seq. (1972), and the Public Health Service Act, 42 U.S.C.A. § 262 et seq. (1982). Each manufacturer of a DPT vaccine has its own proprietary process for creating the vaccine, protected either by trade secret or patent, and often marketed under trade names. Some of the characteristics of the biological products may vary with *609 the processes used. Immunization with the vaccine is required by law, N.J.S.A. 26:1A-7, 30:5B-5; N.J.A.C. 8:57-4.10, and the beneficial effect of the vaccine is generally acknowledged. The immunization program has reduced and in some areas virtually eliminated diphtheria, whooping cough and tetanus in young children.
Plaintiffs, however, contend that the product was defective in that it contained toxins which could have been eliminated by the use of the technology existing at the time the infant plaintiff, Deanna Marrero, was inoculated. Further, plaintiffs assert that the inoculations administered by the defendant physician caused Deanna to suffer a seizure disorder, resulting in chronic encephalopathy and severe retardation, and changing an otherwise normal two-year old into a mental incompetent requiring institutionalization.[2] Deanna's mother first noted the problem immediately following the booster shot, but was told by defendant physician that Deanna's conduct might well be indicative of her entering the "terrible twos." Thereafter, as Deanna's condition steadily worsened, her mother claims she had no indication of the relationship between the DPT injections and her daughter's condition. She testified in a deposition that in June 1984 she
... read an article that was in the Boston paper about the side effects of the D.P.T., well, mainly of the pertussis, and that it could cause brain damage and when I read it, it was like a light went off in my head and I finally saw something in black and white that I had suspected for many years but was never  no one ever really acknowledged that that was what it was.
She also described the regression in her daughter's development:

*610 Her eyes were crossing, her speech regressed and she would not get up when lying down or sitting. She was no longer interested at looking at pictures in a book. She began negative self-stimulation behavior such as compulsively twisting her hands. She began seizure activity. At approximately 4 years she began to grit her teeth, hold her breath and contort her face. She did not reach many of her developmental milestones. At six years she began episodes of hysterical uncontrollable crying. Today as a result of the inoculations, Deanna is severely retarded and requires constant care.
This suit was filed April 12, 1985 when Deanna was 14 years old, nearly 13 years after the administration of the last injection. By that time records were unavailable to the parties as to the identity of the manufacturer of the particular DPT vaccine used by the treating physician. Plaintiffs, therefore, instituted this action against all manufacturers whose products had been used by the treating physician during the period in question, asserting a theory of collective responsibility.[3]
Although the defendant manufacturers have raised various other defenses, treated later in this opinion, the trial judge correctly determined that he was bound by Namm v. Charles E. Frosst & Co., 178 N.J. Super. 19 (App.Div. 1981), which rejected all theories of collective responsibility.[4] While in no way impugning the decision of the trial judge who was bound *611 by existing appellate authority to dismiss the complaint against the drug manufacturers, we now reconsider the Namm holding. Defendants have raised several bases upon which they claim the DPT cases differ from those in which any theory of collective responsibility has been applied. While they disagree that any such theory should apply, they contend that the theories are limited in application to generic or truly fungible products and to factual settings that differ from the one before this court. We will briefly treat these arguments before approaching the central issue of whether New Jersey should adopt one or more of the recognized theories or some modification thereof. These arguments, however, point out some flaws in the recognized theories of responsibility in non-identification cases, primarily in the failure of these rules to adapt to the specific factual settings of individual cases and to coordinate with other recognized tort principles.

I. Preliminary Considerations.

A.
First, defendants claim that they are without fault in plaintiffs being denied access to information concerning the identity of the manufacturer. This was not a case where there is a recognized long latency period and pharmaceutical records were destroyed in the interim, such as in the DES cases. See, e.g., Sindell v. Abbott Laboratories, 26 Cal.3d 588, 163 Cal. Rptr. 132, 607 P.2d 924, cert. den. 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980); and the other DES cases cited infra. The Federal Food & Drug Administration (FDA) has formulated rules and regulations which encompass the licensing, testing, production, distribution, review and approval of each DPT vaccine. One such requirement is that each manufacturer must make a written record of the name and address of each person to whom a specific lot of the vaccine has been distributed and that record must be retained for no less than five years after the date of manufacture or six months after the expiration date for that product, whichever is later. 42 C.F.R. § 73.502(b)(1) (1971); 21 C.F.R. § 600.12(a)(b)(1) (1986). Likewise, although *612 the doctor and his drug distributor had retained their records for several years, they then destroyed them.
Defendants, however, misperceive the element of superior access to information discussed in some cases. It is not an element of a cause of action; rather, it is a consideration to be weighed in a balancing process to determine whether some form of collective responsibility should fairly be applied. In the case before us, there is no question that the applicable statute of limitations has not run since this action was filed during the infant plaintiff's minority. N.J.S.A. 2A:14-21. Even if there had been no tolling statute, the cause of action may well have been preserved under New Jersey's discovery rule. Vispisiano v. Ashland Chemical Company, 107 N.J. 416, 437 (1987); Lopez v. Swyer, 62 N.J. 267 (1973); cf. Hadden v. Eli Lilly & Co., 208 N.J. Super. 716 (App.Div. 1986), certif. den. 104 N.J. 441 (1986).
While the cause of action itself is not barred, a court might nevertheless consider that the imposition of a theory of collective responsibility should be governed by considerations of laches, i.e., an unexplained or inexcusable delay in enforcing a known right resulting in prejudice to the other party. See Gladden v. Public Employees' Retirement System Trustee Board, 171 N.J. Super. 363, 370-371 (App.Div. 1979). But, based upon the limited information before us, it appears that plaintiffs here are without fault in making a late, but not time-barred, claim. There was no showing that the child's mother knew or should have known that encephalitis was a recognized side effect of the DPT vaccine and that she consequently should have made the connection between the vaccination and her daughter's condition, especially since she was reassured of the lack of connection by the treating physician. Cf. Vispisiano v. Ashland Chemical Company, supra; Lopez v. Swyer, supra. If there is a serious factual dispute as to this point and a trial judge determines that it would be equitably inappropriate to apply a doctrine of collective responsibility under particular facts, the issue should be resolved on remand. Abel v. Eli Lilly & Co., 418 Mich. 311, 343 N.W.2d 164, 173 *613 (1984), cert. den. sub nom. E.R. Squibb & Sons, Inc. v. Abel, 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984). Such a future resolution does not affect the underlying ruling here on appeal that no cause of action exists under any theory of collective responsibility.
This "laches" consideration does not directly meet defendants' allegation that they are not in a superior position to plaintiff to determine which manufacturer's product affected the infant plaintiff, and that their inability to identify which of them was the manufacturer was due to plaintiffs' failure to assert their claim promptly. Although the federal requirements mandate only a five year retention of drug records, defendants knew that their drugs were being administered to young children and that a devastating and disabling illness might be caused in a small but acknowledged percentage of cases. Recognizing that statutes of limitation have infancy and incompetency tolling provisions, the drug companies could have chosen to retain their records for a longer period of time, thus obviating the identification problem now before the court. Plaintiffs had no similar ability to resolve the identification problem. This issue, therefore, presents no bar to our determining whether a collective responsibility doctrine is viable in New Jersey.

B.
Defendants next claim that their products are not generic or fungible, and, therefore, all doctrines of collective responsibility are inapplicable. Even acknowledging that defendants' products are protected by patents or trade secrets and differ from each other, we must focus upon the fact that each of the products subjected the user to a similar recognized danger of encephalitis. It makes little difference to a consumer what the internal biological or chemical nature of a product may be if it might cause a specific common health problem. Since there is then no way to determine the particular manufacturer's product *614 on the basis of the result for the purpose of applying a doctrine of collective responsibility, the products must be considered virtually identical. The differences in their composition, except as such differences might affect the frequency of the adverse result, must be considered as irrelevant as the color of the label on the package.

C.
There are, however, differences alleged by defendants in the products insofar as the frequency of encephalopathic disorder caused by each defendant's vaccine. In particular, Eli Lilly asserts that its DPT product, Tri-Solgen, was fundamentally different from that marketed by the other manufacturers.[5] Each manufacturer, however, has records concerning the incidence of chronic encephalitis resulting from the administration of its vaccine. We see no impediment to a defendant introducing such evidence insofar as it affects the probability that its vaccine caused the injury. Since, as noted infra, we have directed the trial judge to proceed applying a risk-modified market share analysis, with several, as opposed to joint and several, responsibility, proof by a defendant of the reduced incidence of encephalitis would result in a proportional lowering *615 of the percentage responsibility for such defendant. This factor, therefore, is relevant, but not exculpating, so long as there is a discernible and quantifiable incidence of the disease from the administration of the product.[6]

D.
Defendants also assert that their vaccines are not a suitable subject for collective responsibility since the toxicity which could cause encephalitis varies not only from manufacturer but also from batch to batch. Were this a true "bad batch" case, i.e., a claim concerning a product which ordinarily created no problems but due to some error in manufacture became toxic, identification of the particular defendant would be mandatory. See, e.g., Centrone v. C. Schmidt & Sons, Inc., 114 Misc.2d 840, 452 N.Y.S.2d 299, 304 (Sup.Ct. 1982); Sheffield v. Eli Lilly & Co., 144 Cal. App.3d 583, 192 Cal. Rptr. 870 (Ct.App. 1983). If defendants advance this "bad batch" defense, it would be incumbent upon plaintiff to prove which manufacturer put the defective product on the market. Plaintiffs, however, have asserted that the product was defective in that it could have been supplied under then-existing technology in a form untainted by the toxins which caused the encephalitis.

E.
Defendants next urge that the product was so inherently beneficial and the incidence of problems was so low that the public interest demands a freedom from liability.[7] The record is replete with defendants' praise of the DPT vaccine and the devastating consequences to the contrary if these vaccines are to *616 be removed from the market. We recognize the benefits of defendants' products. Indeed, in parallel situations where potential liability might have removed similar pharmaceutical products from the market place, Congress has recognized the problem by enacting immunity legislation. See e.g., National Swine Flu Immunization Program of 1976, Pub.L. No. 94-380, 90 Stat. 1113 (1976). Also compare recently enacted New Jersey legislation, N.J.S.A. 2A:58C-4, absolving a manufacturer from liability for harm caused by a failure to warn.
[i]f the warning or instruction given in connection with a drug ... has been approved or prescribed by the federal Food and Drug Administration under the `Federal Food, Drug and Cosmetic Act, 52 Stat. 1040, 21 U.S.C. § 301 et seq. ...,
in which case there is a rebuttable presumption "that the warning or instruction is adequate." In short, if it is legislatively determined that the social utility of producing the product, even if defective, far outweighs the risk to the few individuals who may be harmed, either Congress or the State Legislature may grant an appropriate immunity. But no such immunity now exists.
Compliance with even existing federal regulations might well, upon proper proof, be found to bar plaintiffs' claims insofar as they are based upon a failure to warn. Cipollone v. Liggett Group, Inc., 789 F.2d 181 (3d Cir.1986), cert. den. ___ U.S. ___, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987) (involving adequacy of cigarette labelling and advertising); McQuaid v. Burlington County Memorial Hospital, 212 N.J. Super. 472, 475-476 (App. Div. 1986) (raising the question whether FDA action dictating the warning to be given "does not indeed provide [the drug manufacturer] with an absolute defense"); and compare Feldman v. Lederle Laboratories Inc., 97 N.J. 429, 446 (1984), which left open the issue whether compliance with FDA warnings absolved defendants from strict liability and which found the record in that case insufficient.
to analyze fully the risk and benefits of prescription drugs and to conclude that drug manufacturers should be immune from strict liability for failure to produce drugs that are safe, suitable and fit for their intended purposes.
*617 Unlike the complete product immunity in the cases involving swine flu vaccine, section 4 of the New Jersey statute[8] and the cited cases all involve warning immunities, and thus are limited to failure to warn cases. This, however, is a design defect case, and the warning preemption cases are inapposite. Yet there are also design defect preemption considerations, not yet treated in New Jersey law, but cogently explored in the DPT cases of Toner v. Lederle Laboratories, 112 Idaho 328, 343 n. 12, 732 P.2d 297, 311 n. 12 (1987), and Hurley v. Lederle Lab., Div. of Am. Cyanamid, 651 F. Supp. 993, 1003-1006 (E.D.Tex. 1986). We express no opinion as to this issue which also should be fully explored by the trial judge on remand.
A related question involves the defense to a product claim involving a pharmaceutical product envisioned by comment k to Restatement, Torts 2d, § 402A at 353-354. The comment states:
There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs.
The comment then gives as an example the Pasteur treatment of rabies and notes:
The same is true of many other drugs, vaccines and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician.... The seller of such products, again with the qualification that they are properly prepared and marketed and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken *618 to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.
See Calabrese v. Trenton State College, 162 N.J. Super. 145 (App.Div. 1978), aff'd on other grounds 82 N.J. 321 (1980) (affirming summary judgment for manufacturer, distributor and retailer of drug, and classifying anti-rabies vaccine as an "unavoidably unsafe" product as defined by comment k of Restatement, Torts 2d, § 402A); Brody v. Overlook Hospital, 127 N.J. Super. 331 (App.Div. 1974), aff'd 66 N.J. 448 (1975) (finding blood, contaminated by hepatitis antibodies not then discoverable, as falling within the "unavoidably unsafe" product definition of comment k of § 402A). But we note from the discussion in Feldman v. Lederle Laboratories, supra, of comment k to Restatement, Torts 2d, § 402A, that New Jersey does not read comment k as granting immunity from responsibility upon all makers of prescription drugs.
Comment k immunizes from strict liability the manufacturers of some products, including certain drugs, that are unavoidably unsafe. However, we see no reason to hold as a matter of law and policy that all prescription drugs that are unsafe are unavoidably so. Drugs, like any other products, may contain defects that could have been avoided by better manufacturing or design. Whether a drug is unavoidably unsafe should be decided on a case-by-case basis; we perceive no justification for giving all prescription drug manufacturers a blanket immunity from strict liability manufacturing and design defect claims under comment k. [97 N.J. at 447].
Plaintiffs have here assumed the burden of showing that all of the DPT vaccines manufactured by all of the defendants were in fact defective, in that by defendants' applying the existing scientific knowledge and technology available at the time of manufacture and distribution, the contaminating toxins need not have been present in the serum. The products were not, they claim, "unavoidably" unsafe. But defendants have the burden of proving their affirmative defense under comment k. See Toner v. Lederle Laboratories, supra, 112 Idaho at 339-340, 732 P.2d at 308-309 (applying New Jersey and California authorities). This factual issue in a DPT case, if a viable cause of action exists under one or more of the theories of collective responsibility, must be resolved at trial.

*619 F.
Next, defendants allege that plaintiffs have not eliminated other possible causes for Deanna's tragic condition. This also was a factual issue which properly was not reached by the trial judge, since he determined the matter on the basis of the lack of a viable legal theory upon which liability could have been imposed. This, as well as the other fact-sensitive matters urged by defendants but not passed upon by the Law Division, are not before us on this interlocutory appeal.
Many, if not all, of these issues would have required time-consuming and expensive proof on the part of both plaintiffs and defendants, and the trial judge was correct in disposing of this case on the basis of the underlying legal issue where there was controlling appellate precedent. Since many of the factual issues also would have been raised with respect to the remaining defendant, the treating physician who prescribed the vaccine, we granted leave to appeal this interlocutory determination. Also, this case provides a vehicle for reviewing the decision in Namm, unfettered by the factual analysis which would have been required if the trial judge had disposed of each of these issues. We recognize that in similar situations the Supreme Court has remanded matters to the Law Division for expansion of the factual records. See Wolfsbruck v. Dow Chemical Co., 101 N.J. 252 (1985), and Salomon v. Eli Lilly & Co., 98 N.J. 58, 59-60 (1984). Although the Salomon case, after expansion of the record, apparently is to be reheard by the Supreme Court at some future time, it appears unfair to require both plaintiffs and defendants in this case to expend tens or even hundreds of thousands of dollars in trial costs without knowing whether a viable theory of collective responsibility exists in New Jersey.

II. Theories of Collective Responsibility.

A.
This court in Namm, citing Gray v. U.S., 445 F. Supp. 337, 338 (S.D.Tex. 1978), and textual sources, stated

*620 `it is a fundamental principle of products liability law that a plaintiff must prove, as an essential element of his case, that the defendant manufacturer actually made the particular product which caused the injury.' [178 N.J. Super. at 27].
The Namm court also cited Scanlon v. General Motors Corp., 65 N.J. 582, 590 (1974) for this principle. An examination of Scanlon, however, shows that the Supreme Court focused upon the condition of the product when it left the manufacturer's hands, as the identity of the manufacturer was not in dispute. We find no Supreme Court authority in New Jersey imposing an absolute requirement of identification of a manufacturer. In the usual case it is only "one who sells [i.e., a manufacturer, distributor or a retailer] any product in a defective condition" who is subject to strict liability under Restatement, Torts 2d, § 402A, and there is an extensive series of Supreme Court cases adopting this general principle. We disagree, however, with Namm's finding that any Supreme Court case prohibits our holding each of those who sell substantially similar products (the effects of which after the passage of time cannot readily be distingished from one another) collectively as "sellers" within the meaning of § 402A.
The Namm court next determined, and our dissenting colleague agrees, that "traditional concepts and basic principles would of necessity be either distorted or abandoned altogether" if any theory of alternative liability was adopted. 178 N.J. Super. at 34. Further, the court found, quoting a workers' compensation case, that an intermediate appellate court should "adhere to existing laws of the State and in the absence of appropriate amendatory legislation" should defer to the Supreme Court. Ibid. We fully subscribe to this principle where there is Supreme Court precedent or even dictum to the contrary, or where the Legislature has spoken and the matter is thus taken from the purview of the common law. The majority and dissent welcome the Legislature's entrance into this field, demonstrated by the legislation cited above. But we note that the specific problem before us has not been addressed in the new Act.
*621 If an intermediate appellate or trial court must decide an issue where there is no binding appellate authority or legislation, then it is within the authority of that court, and even its duty, to resolve the issue before it consistent with the court's understanding of the governing law. Here, where there is no indication of the Supreme Court's antipathy to collective responsibility, we perceive our role as one to determine what the Supreme Court would do if faced with the problem before us. Roadway Express, Inc. v. Director, Div. of Taxation, 50 N.J. 471, 475 (1967), app. dism. 390 U.S. 745, 88 S.Ct. 1443, 20 L.Ed.2d 276 (1968); State v. Dolton, 146 N.J. Super. 111, 115 (App.Div.), certif. den. 74 N.J. 252 (1977). The denial of potential liability by Namm was as much a policy statement as our recognition, refinement and application of the recognized tort principles discussed herein. The rejection of these theories which have been developed in states with views of tort law similar to our own would be an unwarranted deviation from what we perceive to be a course already charted by our Supreme Court. Not to follow this course would constitute the very "policy shift" decried both in Namm, 178 N.J. Super. at 35, and the dissent.
Insofar as the central issue of collective responsibility is concerned, the Supreme Court stated in Salomon v. Eli Lilly & Co., supra, that
... we neither approve nor disapprove of Namm v. Charles E. Frosst & Co., supra. In light of our decision to remand the matter to the trial court, we need not pass on validity of any of the potential causes of action or defenses. [98 N.J. at 61].
Such a statement cannot be read as precluding our disagreement with our brethren in Namm.
We look to the past decisions of our Supreme Court to determine whether some form of collective responsibility would be antithetical to principles applied in related fields. We note first that where the issue is not the identity of the manufacturer of a product, but rather the identity of the defendant which *622 caused a particular injury, the Supreme Court has not hesitated to shift the burden of proof to defendants to exculpate themselves. Anderson v. Somberg, 134 N.J. Super. 1 (App.Div. 1973), aff'd 67 N.J. 291 (1975), cert. den. 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975). Similarly, where a plaintiff is unable to identify which of several successive carriers damaged plaintiff's property, the Supreme Court placed the burden upon the carriers to come forward and exculpate themselves. NOPCO v. Blaw-Knox Co., 59 N.J. 274 (1971). Also, in a recent toxic tort case, the Supreme Court in Ayers v. Jackson Tp., 106 N.J. 557, 585-586 (1987), noted in dictum that in mass exposure litigation where identification of the culpable defendant presents a causation problem, resort might be had to the alternative liability theory expressed in Summers v. Tice, 33 Cal.2d 80, 199 P.2d 1 (1948), a case in which plaintiff could not prove which defendant was responsible for his injury, and under those special facts the burden of proof was placed upon defendants to disprove causation. Indeed, our Supreme Court has been in the forefront of jurisdictions to recognize and to protect those injured by the wrongful acts of others. See, e.g., Kelly v. Gwinnell, 96 N.J. 538 (1984); Henningsen v. Bloomfield Motors, 32 N.J. 358 (1960). We, therefore, have no reason to suppose that the Supreme Court would reject all theories of collective responsibility, provided the rights of the defendant manufacturers to exculpate themselves are scrupulously protected. Cf. Ferrigno v. Eli Lilly & Co., supra.

B.
There are four basic theories upon which some measure of industry-wide responsibility has been based: (1) concert of action, (2) alternative liability, (3) enterprise or industry-wide liability, and (4) the market-share modification of enterprise or alternative liability. We will briefly examine each theory, citing some relevant cases expounding the principles.

*623 1.
The concert of action theory is premised upon the substantial assistance of various producers of a product to each other to accomplish a tortious result. The parties
in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or ... lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's acts done for their benefit.... [W. Keaton, D. Dobbs, R. Keaton & D. Owen, Prosser & Keaton on the Law of Torts, § 46 at 323 (5th ed. 1984)].
The concert of action theory is codified in Restatement, Torts 2d, § 876 at 315, and was applied in Abel v. Eli Lilly & Co., supra, 418 Mich. at 336-339, 343 N.W.2d at 176, and in Bichler v. Eli Lilly & Co., 55 N.Y.2d 571, 436 N.E.2d 182, 450 N.Y.S.2d 776 (1982). The "concert of action" is akin to a conspiracy, a label placed upon the misrepresentation and suppression of health hazard information concerning asbestos in Nicolet v. Nutt, 525 A.2d 146, 150 (Del. 1987).

2.
The alternative liability theory is applied where one of a group of tortfeasors is responsible, in which case the burden shifts to the other defendants to exculpate themselves. If they fail to do so, they are liable. See Anderson v. Somberg, supra. This theory is supported by Restatement, Torts 2d, § 433B(3) at 441-442:
Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.
Comments g and h elaborate upon the theory.
g. The rule stated in Subsection (3) applies only where it is proved that each of two or more actors has acted tortiously, and that the harm has resulted from the conduct of some one of them. On these issues the plaintiff has still the burden of proof. The rule stated has no application to cases of alternative liability, where there is no proof that the conduct of more than one actor has been tortious at all. In such a case the plaintiff has the burden of proof both as to the tortious conduct and as to the causal relation.
h. The cases thus far decided in which the rule stated in Subsection (3) has been applied all have been cases in which all of the actors involved have been joined as defendants. All of these cases have involved conduct simultaneous in time, or substantially so, and all of them have involved conduct of substantially *624 the same character, creating substantially the same risk of harm, on the part of each actor. It is possible that cases may arise in which some modification of the rule stated may be necessary because of complications arising from the fact that one of the actors involved is not or cannot be joined as a defendant, or because of the effect of lapse of time, or because of substantial differences in the character of the conduct of the actors or the risks which they have created. Since such cases have not arisen, and the situations which might arise are difficult to forecast, no attempt is made to deal with such problems in this Section. The rule stated in Subsection (3) is not intended to preclude possible modifications if such situations call for it.
See Minnich v. Ashland Oil Co., Inc., 15 Ohio St.3d 396, 397, 473 N.E.2d 1199, 1200-1201 (1984); Bottazzi v. Petroleum Helicopters, Inc., 664 F.2d 49 (5th Cir.1981); Abel v. Eli Lilly & Co., supra; and Summers v. Tice, supra, (applying the theory in a pure negligence action).

3.
The enterprise or industry-wide liability theory imposes liability on all members of an industry which has produced a product causing the particular harm. The defendants then have the opportunity to exculpate themselves. This theory has been described as a hybrid of the concert of action and alternative liability theories. See Comment, "DES and A Proposed Theory of Enterprise Liability," 46 Fordham L.Rev. 963, 974 (1978). The theory was described as one which imposes
... the industrywide standard ... [as] the cause of the plaintiff's injury, just as defendants' joint plan is the cause of injury in the traditional concert of action plea. Each defendant's adherence perpetuates this standard, which results in the manufacture of the particular unidentifiable injury-producing product. Therefore, each industry member has contributed to plaintiff's injury. [Id. at 997].
See Hall v. E.I. DuPont DeNemours & Co., Inc., 345 F. Supp. 353 (E.D.N.Y. 1972) (children injured by exploding blasting caps; defendants through their common trade association chose not to place warnings directly on each blasting cap and neglected to utilize other safety measures).

4.
The last recognized theory is a "market-share" modification of the enterprise or alternative liability theory. The *625 responsibility imposed on each defendant, rather than being equally liable for the damages caused by the product, is limited to the percentage share which that defendant held of the relative market. This theory was propounded in Sindell v. Abbott Laboratories, supra, where the court ruled that all of the defendants who manufactured DES
... will be held liable for the proportion of the judgment represented by its share of that market unless it demonstrates that it could not have made the product which caused plaintiff's injuries. [26 Cal.3d at 612, 607 P.2d at 937, 163 Cal. Rptr. at 145].
In explaining the fairness of the doctrine, the Sindell court quoted the Fordham Law Review article and explained that if all of the products were identifiable, each defendant would in the aggregate be responsible for its product and the damages caused thereby in the same proportion as the share of the relevant market it held. Therefore, a market share theory permits the approximation on a case-by-case basis of the same responsibility that each defendant would have borne had the identification problem not been present. The theory permits injured plaintiffs to recover from responsible parties in cases where identification of the particular manufacturer is difficult if not impossible. 26 Cal.3d at 613, 607 P.2d at 937-938, 163 Cal. Rptr. at 145. This theory, also rejected in Namm, had been accepted in Ferrigno v. Eli Lilly & Co., supra, 175 N.J. Super. at 573.
We perceive some problems even with the apparently fair principles of Sindell, which have been both praised and criticized, and both followed and rejected, in the seven years since the decision. But, contrary to defendants' criticism of Sindell, the opinion imposes no liability upon innocent manufacturers. As stated in Sheffield v. Eli Lilly & Co., supra, the rule of Summers v. Tice, followed in Sindell, "only applies where it is proven that each of two or more actors has acted tortiously." 144 Cal. App.3d at 878, 192 Cal. Rptr. at 878. As in Sheffield, the Sindell approach may be distinguished here if a similar defect is not common to the products of all of the defendants; but the "bad batch" theory applied in Sheffield appears unavailable *626 to defendants in our case. We have before us a case alleging a design defect, rather than a manufacturing flaw.
Some courts outside California have expressed support for or directly followed the Sindell principles. George v. Parke-Davis, 107 Wash.2d 584, 733 P.2d 507 (1987); Goldman v. Johns-Manville Corp., No. L-85-016 (Ohio Ct. App. Jun. 30, 1986) (available on Westlaw), certif. granted No. 86-1470 (Ohio Sup.Ct. Dec. 6, 1986); McCormack v. Abbott Laboratories, 617 F. Supp. 1521 (D.Mass 1985); McElhaney v. Eli Lilly & Co., 564 F. Supp. 265 (D.S.D. 1983); Hardy v. Johns-Manville Sales Corp., 509 F. Supp. 1353 (E.D.Tex. 1981), rev'd on other grounds 681 F.2d 334 (5th Cir.1982). And see Collins v. Eli Lilly & Co., 116 Wis.2d 166, 189-90, 342 N.W.2d 37, 48-49 (1984), cert. den. sub nom. E.R. Squibb & Sons, Inc. v. Collins, 469 U.S. 826, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984) (where defendants' market shares, while not accepted as the sole basis for liability, were to be considered as one element in a wider basis for liability). Similarly, in Martin v. Abbott Laboratories, 102 Wash.2d 581, 689 P.2d 368 (1984), the Washington court, as explained infra, expanded the California market share approach, but utilized the theory in part to establish liability.
Other courts have been equivocal. In Celotex Corp. v. Copeland, 471 So.2d 533 (Fla. 1985), the Florida Supreme Court determined that an asbestos worker was able to identify at least a majority of the manufacturers which supplied the asbestos that had allegedly injured him. While recognizing the market share theory as the majority view, the court determined the approach adopted by the intermediate appellate court, 447 So.2d 908 (Fla.Ct.App. 1984), to be inappropriate to the facts of its case and found it unnecessary "to accept or reject the market theory approach." 471 So.2d at 539. Similarly, in Bixler by Bixler v. Avondale Mills, 405 N.W.2d 428 (Minn.App. 1987), the Minnesota Court of Appeals found the facts of the case to be inappropriate for the adoption of a theory of collective responsibility. The Minnesota Supreme Court, in remanding *627 the matter in an earlier phase of the litigation, had expressed "no opinion as to whether we would adopt" a rule of market share liability. Bixler by Bixler v. J.C. Penney Co., Inc., 376 N.W.2d 209, 214 (Minn. 1985).
In Payton v. Abbott Labs, 386 Mass. 540, 437 N.E.2d 171 (1982) the plaintiffs were a class alleging injury as a result of DES ingestion by their mothers. The Massachusetts Supreme Judicial Court chose not to follow Sindell because of the court's concern with the inability of a non-negligent defendant or one who could prove a lack of causation to exculpate itself. 386 Mass. at 572-573, 437 N.E.2d at 189. On the basis of the record before it, the court indicated that it would not create a theory under which plaintiffs could recover without meeting the requirement of identification of the manufacturer, especially since the matter was brought to it merely on a certification of a question from the Federal District Court. It stated, however
That is not to say that on an adequate record this court would not recognize some relaxation of the traditional identification requirement in appropriate circumstances so as to allow recovery against a negligent defendant of that portion of a plaintiff's damages which is represented by that defendant's contribution of DES to the market in the relevant period of time. [386 Mass. at 574, 437 N.E.2d at 190].
The court concluded:
We have indicated, however, the view that we might permit recovery from those defendants shown to be negligent to the extent of their participation in the DES market, even though the plaintiffs cannot identify the particular source of DES which their mothers ingested. [386 Mass. at 575, 437 N.E.2d at 190].
The case of McCormack v. Abbott Laboratories, 617 F. Supp. 1521 (D.Mass. 1985) provided the Federal District Court in Massachusetts with the factual scenario envisioned in the Payton dictum. In McCormick, the court utilized a market share theory, presuming that all of the named defendants held equal shares of the market. However, the court gave the defendants an opportunity to prove their actual market share. Id. at 1526-1527.
*628 The federal courts generally have split on whether to adopt any of the four recognized theories. Some have accepted one or more of the theories. See, e.g., Bottazzi v. Petroleum Helicopters, Inc., supra, (alternative liability theory); Borel v. Fibreboard Paper Prod. Corp., 493 F.2d 1076 (5th Cir.1973), cert. den. 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974) (enterprise liability theory); McCormack v. Abbott Laboratories, supra, (market share theory); McElhaney v. Eli Lilly & Co., supra, (alternative liability theory); Hardy v. Johns-Manville Sales Corp., supra, (market share theory); Morris v. Parke, Davis & Co., 573 F. Supp. 1324, 1326-1330 (C.D.Cal. 1983) (DPT case applying a market share theory); Hall v. E.I. du Pont de Nemours & Co., Inc., supra, (enterprise liability theory). Other federal courts have rejected the theories, generally for the reason that the states in which they sit have not yet adopted any of the theories. See, e.g., Thompson v. Johns-Manville Sales Corp., 714 F.2d 581, 583 (5th Cir.1983), cert. den. 465 U.S. 1102, 104 S.Ct. 1598, 80 L.Ed.2d 129 (1984); Morton v. Abbott Laboratories, 538 F. Supp. 593, 599 (M.D.Fla. 1982); Mizell v. Eli Lilly & Co. 526 F. Supp. 589, 596 (D.S.C. 1981); Ryan v. Eli Lilly & Co., 514 F. Supp. 1004, 1018-1019 (D.S.C. 1981). Still other federal courts have rejected the theories on the basis that the product involved did not lend itself to a market share or any other collective responsibility analysis. See, e.g., Hurley v. Lederle Labs., supra, (also finding federal preemption in case involving DPT serum); Hannon v. Waterman S.S. Corp., 567 F. Supp. 90 (E.D.La. 1983) (noting also that plaintiff had identified some asbestos suppliers but failed to join the country's largest supplier); In re Related Asbestos Cases, 543 F. Supp. 1152, 1158 (N.D.Cal. 1982). In the last-cited case, the court held that the market share theory cannot be applied in all contexts and that asbestos fibers, being of several varieties and used in varying quantities by the defendants in their products, had differing harmful effects. Also, there were significant difficulties in the case defining what constituted the relevant product market and which defendants manufactured or *629 distributed the products over the extended period during which plaintiffs were exposed to asbestos.
Apparently, the highest courts of only two states, Missouri and Iowa, have unqualifiedly rejected all theories of collective responsibility. In Zafft v. Eli Lilly & Co., 676 S.W.2d 241 (Mo. 1984), a DES case, the Missouri Supreme Court on a public policy basis rejected all theories of collective responsibility. The court stated that a contrary decision would "discourage desired pharmaceutical research and development while adding little incentive to production of safe products." Id. at 247. In Mulcahy v. Eli Lilly & Co., 386 N.W.2d 67 (Iowa 1986), another DES case, the Iowa Supreme Court on a certified question noted the inapplicability of the alternative liability and enterprise liability theories to DES cases. It rejected the market share theory on policy grounds, calling it "social engineering more appropriately within the legislative domain." Id. at 76. And see Burnside v. Abbott Laboratories, 351 Pa.Super. 264, 505 A.2d 973, 986-987 (Sup.Ct. 1985) (where an intermediate appellate court expressed antipathy to all theories; but further noted that all defendants before the court could have exculpated themselves under the market share theory on the facts of the case).
Another state had extended the Sindell rationale. The Wisconsin Supreme Court in Collins v. Eli Lilly & Co., supra, expanded market share responsibility under the Sindell rationale to require suit against merely one supplier[9] who then could reduce its liability by joining other manufacturers. A judgment against multiple defendants would be based upon a *630 "comparative negligence scheme" one factor of which is the extent of the defendants' market. 342 N.W.2d at 50-54.[10]
Similarly, in Martin v. Abbott Laboratories, supra, the Supreme Court of Washington, rather than recognizing any of the established theories, independently adopted a modified market share theory. Like the Collins court, the Washington court expanded liability by permitting a plaintiff to join but one manufacturer and prove that the defendant manufactured or marketed the product (there DES) which caused the injury. The burden then would be shifted to the defendant to prove its percentage share of the market and to implead other potential defendants to reduce its presumptive equal share of the market. The court imposed an added stipulation that those defendants remaining in the case were presumed to have produced the entire market upon which the final percentages of liability were to be based unless they proved that they had a smaller portion of the total market by reason of the participation of other unjoined manufacturers. 689 P.2d at 382-383.

C.
Recognizing these different available theories of collective responsibility and mindful of some jurisdictions' rejection of all such theories, we now also adopt a modified market share approach. Our analysis differs somewhat from that of Wisconsin in Collins or Washington in Martin in that it gives each defendant a fuller opportunity for exculpation. We find such an approach in keeping with the guiding principles of Anderson v. Somberg, supra, 67 N.J. at 298-303 (plurality opinion). A plaintiff should first demonstrate that the specific manufacturer of a defective product proven to have caused the injury cannot be identified, and join the manufacturers of a substantial *631 share of the relevant market, defined as all who could have distributed the product to the plaintiff. Once this has been accomplished, the burden is placed upon the defendants to exculpate themselves by proving either non-participation, possession of reduced market share or that their product engendered a lower risk. Our aim should be to determine the percentage of the potential risk to the plaintiff caused by each manufacturer of the product, and in this respect our resolution of this issue departs somewhat from a pure market share analysis. As we see our risk-modified market share liability, it most closely defines responsibility as proportional to the potential danger to the public created by the risk of each defendant's product as that risk specifically affected the injured plaintiff.[11]
Probably the best foundation for the application of this modified market share theory is the seminal decision of Summers v. Tice, supra. There, plaintiff went hunting with the two defendants who were cautioned to stay in line and be careful. However, when a bird was flushed, both defendants fired, even though plaintiff was directly in the line of fire and clearly visible. The one pellet struck plaintiff in his eye and another in his upper lip, but the sources of neither shot could be identified. The defendants were held jointly and severally liable, 199 P.2d at 3-4, and the decision was codified in Restatement, Torts 2d § 433B(3), quoted earlier.[12]
Defendants have urged that the case before us is distinguishable from Summers, since in Summers all possible negligent parties were before the court, yet in this case there is an additional supplier of DPT vaccine who was not joined, and now *632 since oral argument before us, it appears that another defendant has settled. Is it necessary for all the defendants to be before the court? While we take no issue with the California requirement that defendants representing a substantial portion of the market be joined, we see no basis to require that all defendants be before the court. No defendant will be responsible for a greater portion of the judgment than that attributable to the risk it created. We recognize that some manufacturers in our case, by dint of their larger market shares, supplied many more doses of the vaccine than others. This would be the equivalent in Summers terms of one of the defendants having fired more shots, thereby increasing the likelihood that he was the one who hit the plaintiff. But in our case, Eli Lilly also contends that its product was safer than that of its competitors and that it can quantify this difference. This might be the equivalent in Summers terms of one defendant contending that he used shells with fewer pellets and, therefore, was less likely to have been the one to have hit plaintiff. Again, if the differences can be suitably quantified, there is no reason why the fact finder could not adjust the respective market shares, recognizing the varying risks of harm created by each defendant's product. See Rosenberg, "The Causal Connection in Mass Exposure Cases: A `Public Law' Vision of the Tort System," 97 Harv.L.Rev. 851, 867 (1984).

D.
Out of a sense of fairness for defendants, we have recognized in this case a risk-modified market share theory, rather than one imposing equal responsibility or one based solely on the market share of each supplier. This same motive compels us to look further into defendants' responsibility for the eventual payment of any judgment. Sindell does not specify whether the responsibility of defendants would be joint and several or several. This factor becomes relevant, if in the event of a bankruptcy of a defendant or other inability either to join a defendant or to collect a judgment, any defendant pays more than its allocated share. This issue was considered in Martin v. Abbott Laboratories, supra, 689 P.2d at 384-388 and *633 reconsidered in George v. Parke-Davis, supra, 733 P.2d at 513. The premise of the market share theory is that it makes little difference in the aggregate if, for example, a defendant is liable for 100% of the damages on proof of actual manufacture in 30% of the cases or for 30% of the damages where identification cannot be established in 100% of the cases. But it would distort this reasoning if a missing defendant's responsibility was to be imposed upon one actually joined in the action. Under New Jersey's liberal long-arm rule, R. 4:4-4(c) and (e), all manufacturers and distributors of a product that should be subject to the market share analysis can procedurally be joined by a plaintiff. If a particular potential defendant is defunct or otherwise is not joined, the other defendants should not be penalized. But neither should the missing defendant's presence or absence in the suit affect the actual defendants' full exposure to the claims engendered by their percentage of the relevant market. Through discovery, a plaintiff can make a prima facie showing of market and risk percentages, after which defendants can come forward and attempt to reduce these figures; but it does not appear to us to be unfair to place the initial burden of allocation on the plaintiff. Under these special circumstances we further determine that the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq., and specifically 2A:15-5.3, would be inapplicable to recoveries under this market share theory where the liability as imposed already takes into account the allocation among or between defendants.[13] In short, the responsibility of defendants should be several, rather than joint and several. Prosser & Keaton, Torts, (4 ed.) § 103, p. 714 (1984).

E.
We should also briefly discuss the applicable market upon which the trial court must focus. Unlike some of the *634 asbestos cases noted earlier where exposure occurred at different sites over a long period of time, the market in a case such as the one before us is easily defined.[14] A distributor serviced the prescribing doctor and, therefore, the proper inquiry is the percentages of doses of vaccine supplied to the doctor. If the doctor had preferences concerning one type of vaccine or another and can quantify the percentages used, so much the better; if not, these percentages can be reconstructed by existing sales records. The aim is not certainty but reasonable approximation.

F.
While we have here endorsed a risk-modified market share theory of manufacturers' responsibility in non-identification cases, with appropriate safeguards to defendants, we have also recognized that there are many defenses dependent upon the resolution of threshold factual issues. Principal among these are the issues of defect and preemption. Upon remand, the trial court should impose responsibility upon defendants only if the standards to which plaintiffs seek to hold defendants have not been preempted by federal regulation, and if plaintiffs otherwise demonstrate that the product, with its recognized utility, was indeed defective, given the existing technology when it was manufactured and distributed. See Feldman v. Lederle Laboratories, supra, 97 N.J. at 452. We neither endorse nor encourage any wholesale liability of the drug industry, but only the imposition of liability insofar as a plaintiff is able to prove that a defendant has distributed a product that is not fit, suitable, and safe for its intended purpose.
*635 We reiterate that we here determine only the narrow issue for which the interlocutory appeal was granted, namely whether New Jersey rejects all bases for collective responsibility in a case where the specific manufacturers of a proven defective product which was shown to have caused plaintiff's injuries cannot be identified. We have resolved this question, and, therefore, remand this matter to the Law Division for further proceedings.
Reversed and remanded.
STERN, J.A.D. (concurring)
No party in this case contends that the recently enacted products liability legislation, L. 1987, c. 197, even if otherwise applicable to the basic claims in this litigation, would apply to this action already pending at the time of enactment. See L. 1987, c. 197, § 8. See also N.J.S.A. 1:1-14. I therefore concur in the judgment of remand for the reasons I express, but would, nevertheless, give the parties the opportunity to address whether any policies embodied in the new legislation should affect this litigation, as a matter of sound judicial policy, even if the legislation is not itself applicable.
I join Judge Dreier in reversing the pretrial dismissal of portions of plaintiffs' complaint. I do so, and depart company with Judge Shebell, because of my reading of the judicial precedents, both inside and outside of New Jersey, and in the absence of controlling legislation. In the only analogous New Jersey cases our Supreme Court ruled in favor of the plaintiffs whose cases had been dismissed in reliance on Namm v. Charles E. Frosst & Co., 178 N.J. Super. 19 (App.Div. 1981), and "remanded to the trial court to enable the parties to attempt to develop a more complete record relating to the issue of liability and proximate cause" and to "reconsider the evidence to determine whether there are presented triable issues on the merits." Wolfsbruck v. Dow Chemical Co., 101 N.J. 252 (1985). See also Salomon v. Eli Lilly and Co., 98 N.J. 58, 61 (1984). Thus, *636 I agree with Judge Dreier that reliance upon Namm, a DES case, would be inappropriate in light of those remands. However, I also believe that consideration of the out-of-State DES cases is of limited value because of the differences between DES and DPT.
The text of a recent annotation states that enterprise or industry-wide liability has been imposed in drug cases only with respect to DES. Annotation, "`Concert of Activity,' `Alternative Liability,' `Enterprise Liability,' or similar theory as basis for imposing liability upon one or more manufacturers of defective uniform product, in absence of identification of manufacturer of precise unit or batch causing injury," 22 A.L.R. 4th 183 (1983). After discussing the "concert of action" and "alternative liability" theories, the annotation states,
The third theory upon which recovery has been attempted is enterprise- or industry-wide liability. This theory of liability is a hybrid, derived from concepts of alternative and concurrent liability and the law of products liability to form a type of absolute liability. At the current time, it has been applied to three types of products: (1) diethylstilbesterol, a synthetic estrogen commonly known as DES; (2) blasting caps; and (3) asbestos. Under this theory the plaintiff can recover from all of the manufacturers of the product if he can show that the identity of the precise manufacturer of the injury-causing product cannot be established, and that the manufacturers jointly controlled the risks created by the product. Thus, after the plaintiff proves exposure and injury caused by the product, the burden shifts to the industry defendants to exculpate themselves by proving that an individual manufacturer's product could not have caused the injury. If the defendants cannot isolate causation, then liability is apportioned among the defendants in accordance with a percentage share of relevant sales market. Therefore, market share apportionment is an inherent part of enterprise liability which, at present, does not appear to stand as a viable contribution theory absent its use in the enterprise liability theoretical framework. [22 A.L.R.4th at 185; footnote omitted].
As explained in Hurley v. Lederle Lab., Div. of American Cyanamid, 651 F. Supp. 993 (E.D.Tex. 1986),
DPT is comprised of three component parts: (1) diphtheria toxoids; (2) tetanus toxoids; and (3) a pertussis vaccine. 50 Fed.Reg. 51,013-14 (1985).
The pertussis component of DPT is a `whole cell' vaccine that contains, in an inactivated state, all of the components found in pertussis cells. 50 Fed.Reg. 51,043 (1985). Pertussis is a serious, highly contagious disease, primarily *637 affecting infants and children. Before the introduction of this `whose cell' vaccine, pertussis crippled and killed thousands of children annually in the United States. In 1934, when this country suffered its worst pertussis epidemic, there were 265,000 reported cases of pertussis per year, and 7500 related deaths. Hinman and Koplan, Pertussis and Pertussis Vaccine: Reanalysis of Benefits, Risks and Costs, Journal of the American Medical Association (June 15, 1984). By the early 1940's, pertussis was responsible for two and one-half times the number of deaths as all of the following diseases combined: measles, mumps, rubella, diphtheria, polio, meningitis, chicken pox, and scarlet fever. Id. Although the disease pertussis has been largely brought under control, it remains a leading cause of infant deaths in other countries which lack vaccination programs. Moreover, the bacteria causing pertussis remain persistent, even where the disease is under control, which leads to the substantial probability of epidemics whenever the use of the DPT vaccine declines significantly. For these reasons, federal public health authorities, including the Food and Drug Administration (FDA), the Centers for Disease Control, the National Institute of Health, and other agencies, have for almost forty years, promoted vaccination of the populace with a diphtheria-tetanus-pertussis vaccine containing the so-called `whole cell' pertussis vaccine, licensed by the FDA in 1949.
However, it is suspected that the pertussis component of DPT can cause adverse reactions such as those listed on the package insert and suffered by plaintiff, since it is not well understood which parts of the organism are responsible for creating immunity. See, 50 Fed.Reg. 51,043 (1985)....
DPT vaccine is a prescription biological product, subject to the provisions of the Pure Food, Drug and Cosmetic Act (21 U.S.C. § 301 et seq.), the Public Health Service Act (42 U.S.C. § 262), and the regulations promulgated thereunder. [651 F. Supp. at 995-996; footnote omitted].
See also Toner for Toner v. Lederle Laboratories, 779 F.2d 1429, 1430-1431 (9th Cir.1986). In New Jersey, immunization with the DPT vaccine is required by law. N.J.S.A. 26:1A-7; N.J.S.A. 30:5B-5; N.J.A.C. 8:57-4.10.
On the other hand, DES is a synthetic estrogen in prescription drug form which "was promoted for use by pregnant women to prevent loss of the fetus by spontaneous abortion" or miscarriage. Namm v. Charles E. Frosst & Co., supra, 178 N.J. Super. at 25. Its development and purposes are comprehensively detailed by Judge Castano in Ferrigno v. Eli Lilly and Co., 175 N.J. Super. 551, 561-565 (Law Div. 1980). Suffice it to say that, unlike DES, the DPT vaccine is not a generic drug and its use is mandated by law.
There are many other distinctions between the drugs and, therefore, consideration of the DES cases must be understood *638 in that context. It is at least arguable that, despite its unavoidable and inherent risks, DPT should be marketed without exposure to civil liability because of its overall impact which protects public health. See 2 Restatement, Torts 2d, § 402A comment k (1965). This is true despite the fact that questions have been raised about its benefits, and "Medical evidence indicates that the safety and efficacy of DPT vaccines may not reach the levels that some physicians assume they do.... In fact, the degree of safety and efficacy of DPT may vary from vial to vial, and lot to lot." Hurley v. Lederle Lab., supra, 651 F. Supp. at 1003. Cf. Toner v. Lederle Labs., supra, 779 F.2d at 1430 (referring to Lederle as the sole manufacturer of at least the Tri-Immunol DPT vaccine there involved).
Hence, I would be particularly guided by the recent cases which have directly considered the issues with respect to the DPT vaccine. In Toner v. Lederle Labs, supra, defendant was the only distributor of the Tri-Immunol vaccine involved in the products liability action which followed a paralysis occurring after injection of the drug. The Ninth Circuit certified questions of state law to the Supreme Court of Idaho which adopted the Restatement § 402A as a matter of Idaho law, 112 Idaho 328, 732 P.2d 297 (1987), but held that the civil immunity embodied in comment k does not apply to manufacturing flaws and did not provide a blanket immunity from strict liability design defect claims. The court held that a trial as to liability for a manufacture defect as well as negligence was required.[1] The court made clear that "comment k intends to shield from strict liability products which cannot be designed more safely ..." 732 P.2d at 305, and where there is "no feasible alternative design which on balance accomplishes the subject's purpose with a lesser risk." 732 P.2d at 306. Significantly, the court, citing Feldman v. Lederle Laboratories, 97 N.J. 429 (1984), held that "Courts must decide the applicability of comment k *639 case-by-case, and only after taking evidence related to the various factors ..." relevant to the balancing of benefits and risks. 732 P.2d at 309. The court also noted that the risk at the time of distribution controlled, and that "[n]o strict liability attaches if, contrary to the best available information, the risk later proves greater" than originally contemplated. 732 P.2d at 307.[2]See also Flood v. Wyeth Labs, Inc., 183 Cal. App.3d 1272, 228 Cal. Rptr. 700 (Div. 5 1986) (no immunity despite state law requiring administration of required DPT vaccine to school children); Feldman v. Lederle Labs, 97 N.J. 429 (1984) (considering application of comment k to prescription drugs and finding no blanket immunity from strict liability and design defect claims). The comment k analysis is significant because if there is immunity for all manufacturers, we would not have to reach the identification issue. However, at least absent controlling legislation on the subject, it appears that the question of immunity requires "a full evidentiary hearing such as only a trial court can provide." Toner v. Lederle Labs., supra, 732 P.2d at 308, citing our Supreme Court's opinion in Feldman v. Lederle Labs., supra.[3]
In Hurley v. Lederle Labs, supra, the United States District Court held, inter alia, that
a state common law determination that DPT design and manufacture is defective will seriously and irreconcilably conflict with the federal regulatory scheme and the national policies of immunization, adequate production and supply of *640 DPT. In effect, it will chill the efforts of the federal government to ensure that all U.S. children are immunized and frustrate Congress' intent in fostering such programs. [651 F. Supp. at 1006].
The opinion indicates that FDA regulations and national policy have changed from time to time as have the methods used to manufacture the DPT vaccine.
In Morris v. Parke, Davis & Co., 573 F. Supp. 1324 (C.D.Cal. 1983), the District Court dealt with the ability to impose punitive damages when an infant suffered irreversible brain damage following a DPT injection. It noted that Sindell v. Abbott Labs, 26 Cal.3d 588, 607 P.2d 924, 163 Cal. Rptr. 132 (Sup.Ct. 1980), cert. den. 449 U.S. 912, 101 S.Ct. 285-286, 66 L.Ed.2d 140 (1980), held that once plaintiff could show that DES caused the injury and that defendants produced a substantial percentage of the DES market, "the burden of proof would then shift to defendants to prove that they could not have made the substance that injured plaintiff," 573 F. Supp. at 1325, and that "each defendant unable to sustain that burden would be held liable for the proportion of the judgment represented by its share of the market," id. The court, applying California law, denied defendants' motion to strike a claim for punitive damages and held that:
[i]f plaintiffs succeed in establishing liability under the market share theory of Sindell, and can further show that one or more of the defendants marketed DPT with conscious disregard for human safety, they will be entitled to recover punitive damages from each such defendant. [573 F. Supp. at 1330].
While the Morris court was bound to follow California law and apply the law as established by the Supreme Court of California, I find significant that Morris upheld market share liability in the only DPT case I can find which directly addresses the issues with which we deal. Moreover, Idaho has declined to bar DPT claims as a matter of law. I am therefore prepared to join Judge Dreier in remanding because I am persuaded that even if we are overstepping prudent exercise of appellate authority and possibly recognizing a new theory of liability in New Jersey, see Namm, supra, 178 N.J. Super. at 35, the remand will permit development of an adequate record from which the Supreme *641 Court can review the matter in the context of specific fact finding. Cf. Wolfsbruck v. Dow Chemical Co., supra; Salomon v. Eli Lilly & Co., supra. See also Toner v. Lederle Labs, supra, 732 P.2d at 308-309.[4] Moreover, as the manufacturers understood that the vaccine would be given to minors, placing the burden of identification on defendants who did not retain their records would promote existing legislative policy flowing from N.J.S.A. 2A:14-21 which tolls the statute of limitations until a minor reaches maturity.[5]
I emphasize that no preemption issue has apparently been raised in the trial court. If one is raised, our remand does not preclude its consideration before trial, cf. Hurley v. Lederle Labs, supra, and the preemption issue should be considered in the context of rules, regulations and processes as they stood at times relevant to this case. See also Feldman v. Lederle Labs, supra, at 458-461.
I also emphasize that comprehensive legislation in this area is appropriate. Cf. In re Farrell, 108 N.J. 335, 341 (1987). It is particularly necessary to promote "new or experimental drugs for which `there can be no assurance of safety.'" Toner v. Lederle Labs., supra, 732 P.2d at 307. I agree with much of what Judge Shebell says in dissent, but absent controlling legislation, we are bound to follow the judicial precedents available on the *642 subject.[6] Nevertheless, on remand the trial court should consider the impact of recent legislation which could affect the issues in this case as a matter of sound judicial policy.
I therefore concur in the reversal of the summary pretrial dismissal and in the remand for further proceedings.
SHEBELL, J.A.D., dissenting.
I fail to see why the principle relied upon in Namm v. Charles E. Frosst & Co., 178 N.J. Super. 19, 33-35 (App.Div. 1981) does not remain viable. In Namm we refused to adopt the proposed theories of liability that would dispense with "traditional concepts and basic principles" because "[a]s an intermediate appellate court we adhere to existing laws of the State and in the absence of appropriate amendatory legislation `any departure from it should be undertaken by the court of last resort and not by the appellate division.'" Id. at 34 (citing Silagy v. State, 105 N.J. Super. 507 (App.Div.), certif. den. 54 N.J. 506 (1969)). We further stated in Namm that:
Extensive policy shifts of this magnitude should not be initiated by an intermediate appellate court. The appropriate tribunal to accomplish such drastic changes is either the Supreme Court or the Legislature. [Id. at 35 (citations omitted)].
Here, not only has the majority permitted a cause of action to proceed against multiple defendants who may have no relationship whatsoever to the product which caused the damage, they have chosen to do so by the creation of a unique mechanism known as "a risk-modified market share theory." This formula has many facets which could be subject to substantial debate, including whether it is warranted and/or just. I do not believe this court should in such circumstances make the choice.
*643 Further, I perceive that the creation of the majority may serve to cripple our judicial system's ability to handle the weight of the litigation it will engender. This will, I fear, add unduly to the cost of the end product and discourage the production of needed drugs and commodities. In Namm there were 300 companies producing the drug and 74 defendants named. It seems apparent that the overall cost of defending such litigation in virtually every case will far exceed the plaintiff's recovery.
We have fortunately reached the point where our Legislature has recognized its obligation to take action in regulating liability in product cases by balancing the interests of the public and the individual with a view towards economic reality. E.g., S. 2805, 202d N.J.Legis., 2d Sess. § 4 (1987) (signed by the Governor on July 23, 1987). We should neither usurp that function nor put the Legislature in a position of having to react to what may well be unwarranted judicial fiat.
I would affirm.
NOTES
[1] In addition to the named defendants, Merck & Co., Inc., Abbott Laboratories and The Upjohn Co. were granted leave to appear as amici curiae.
[2] Deanna was born October 26, 1970. The drug was administered in four doses on May 4, 1971, June 15, 1971 and October 19, 1971, with a booster shot administered October 24, 1972, two days before Deanna's second birthday. After the booster shot Deanna first showed symptoms of extreme pain, after which her condition rapidly deteriorated, causing the loss of her then-acquired verbal, motor, and mental capacities. At the present time she is not considered even educable.
[3] Additionally, plaintiffs assert liability on the basis of probability, i.e., that the majority supplier of the drug, Lederle Labs, might be held liable as the majority producer of the product, even if no theory of collective responsibility is recognized by the New Jersey courts. We reject plaintiffs' theory of majority manufacturer liability first expounded at oral argument. First, we need not pass upon any matter not determined by the trial judge. Second, we see no merit to the theory. Under the logic of this approach, the majority manufacturer of a defective product marketed in a state by an entire industry would assume the responsibility for all injuries caused by the product in situations where the particular manufacturer could not be identified. This result would be inconsistent with the approach we take in this opinion to the non-identification problem.
[4] Namm was followed as stating New Jersey law in Pipon v. Burroughs-Welcome Co., 532 F. Supp. 637 (D.N.J. 1982), aff'd o.b. 696 F.2d 984 (3rd Cir.1982). Cf. Lyons v. Premo Pharmaceutical Labs, Inc., 170 N.J. Super. 183 (App. Div.), certif. den. 82 N.J. 267 (1979). But see the cogent opinion in Ferrigno v. Eli Lilly & Co., 175 N.J. Super. 551 (Law Div. 1980), another DES case, which was disapproved in Namm, 178 N.J. Super. at 32 n. 3.
[5] Eli Lilly contends that it had perfected and patented a process which permits the discarding of unwanted cell debris by extracting through centrifugation the protective antigen from the pertussis cell wall. This allegedly resulted in a marketedly lower incidence of systemic and local reactions, rendering this vaccine safer. In Toner for Toner v. Lederle Laboratories, 779 F.2d 1429, 1430-1431 (9th Cir.1986), the court stated that while Eli Lilly produced its vaccine during this period, its fractionated vaccine was withdrawn from the market after the FDA refused to recertify it as "safe and effective." From documents presented to us, it appears that Lilly remained licensed to manufacture Tri-Solgen until December 2, 1985, following its voluntary request that its license be revoked without prejudice. Moreover, the statement in Toner that Lederle's whole-cell vaccine, Tri-Immunol, remained the only licensed DPT vaccine distributed in the American market (Ibid.), also appears incorrect, in that other whole-cell manufacturers were licensed to produce and did produce DPT vaccines during the period in question. 50 Fed.Reg. 51003-04 (Dec. 13, 1985).
[6] This matter is further discussed infra as an appropriate modification of the market-share theory of collective responsibility.
[7] As noted in Toner for Toner v. Lederle Laboratories, supra:

Severe reactions include encephalopathy, paralysis, and even death. The expected rate of severe reactions ranges between one in 100,000 and one in 310,000 doses. [779 F.2d at 1430-1431].
[8] Indeed the new statute, N.J.S.A. 2A:58C-5(c), provides no absolute protection for design defects in FDA approved drugs. The section merely affords immunity against punitive damages if there was either FDA pre-marketing approval or if the product was recognized as "safe and effective" under applicable FDA conditions and regulations. The broader protection under § 4 noted earlier applies solely to claims of failure to warn.

Furthermore, § 3 appears inapplicable, since plaintiffs assert that the improved design was known to the industry at the time of Deanna Marrero's innoculations. We emphasize, however, that the point raised in Judge Stern's concurrence regarding the public policies underlying the legislation should be considered and applied by the trial court.
[9] In contrast, Sindell had held that the suppliers of a substantial share of the market must be before the court before the market share theory would be applied. Additionally, in Murphy v. E.R. Squibb & Sons, Inc., 40 Cal.3d 672, 684, 221 Cal. Rptr. 447, 455, 710 P.2d 247, 255 (1985), the California Supreme Court indicated that joining defendants which supplied a mere 10% of the DES market would be an insufficient basis to invoke the market share theory.
[10] A difficulty with this approach is the court's mixing of the concepts of negligence and strict liability. Many of the factors suggested by Collins relate to the actions of the specific defendant up to and after FDA approval was secured. We suggest that once the product is shown to be defective, the strict liability theory obviates the necessity for such proof, even if limited, as in Collins, solely to "apportion liability."
[11] The differences among various risks was a problem recognized in Comment, "Market Share Liability: An Answer to the DES Causation Problem," 94 Harv.L.Rev. 668, 679 (1981). We have endeavored to resolve the issue here.
[12] The tort in Summers v. Tice, was negligence, and, in our case, is alleged to be strict liability engendered by defendants' placement of a defective product on the market. Since the Restatement focuses on tortious conduct generally, this difference is not material.
[13] This result is opposite to that reached in Collins v. Eli Lilly & Co., supra, 342 N.W.2d at 52-54, where the negligence-type apportionment of damages under the comparative negligence statute is required of the jury after the establishment of strict liability for the product.
[14] Where the relevant market as it affected a particular plaintiff is difficult to determine, a state-wide, regional, even national analysis may be necessary to achieve a fair apportionment. But in the case before us, we see no such problem, and any broader resolution must await a case presenting appropriate facts.
[1] The court explained that "comment k excepts unavoidably unsafe products from strict liability only where the plaintiff alleges a design defect, and not where the plaintiff alleges a manufacturing flaw or an inadequate warning." The court added that "comment k intends to shield from strict liability products which cannot be designed more safely; however, if such products are mismanufactured or unaccompanied by adequate warning, then the seller may be liable even if the plaintiff cannot establish the seller's negligence." 732 P.2d at 305.
[2] However, "the immunity is not perpetual," 732 P.2d at 307, if new information or developments subsequently tip the balance.
[3] I do not address whether or how the new legislation addressing liability, burdens and presumptions might affect this proposition. See L. 1987, c. 197, §§ 2, 3, 4, 7.
[4] In NOPCO Chemical Div. v. Blaw-Knox Co., 59 N.J. 274 (1971) and Anderson v. Somberg, 67 N.J. 291 (1975), cert. den., 423 U.S. 929, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975) one of the defendants had to be responsible for the injury to plaintiff. Here, plaintiffs still must prove causation, and the issue is whether the burden of showing identification should change once causation is proven. NOPCO and Anderson are distinguishable, but indicate the approach our Supreme Court has already taken in analogous situations. In any event, the issues which we address today relate only to whether plaintiffs can make any showing or whether the pretrial dismissal, as a matter of law, was proper irrespective of the proofs.
[5] As Judge Dreier implies, slip opinion at 8, the problem in this case arises because defendants did not retain their records beyond the period required by the FDA. No preemption issue has been raised in this context.
[6] As I have already stated, I do not consider the impact of legislation that has been enacted since oral argument in this case, as the parties do not claim that any such legislation controls. I do not think it appropriate for me to address that subject in the absence of briefing and argument.